**CPC INTERNATIONAL, INC.,**
**Plaintiff,**

v.

**STANDARD BRANDS INCORPORATED,**
**Defendant.**

**Civ. A. No. 4196.**

United States District Court,
D. Delaware.

Nov. 26, 1974.

**1058**

Thomas S. Lodge of Connolly, Bove & Lodge, Wilmington, Del., Dugald S. McDougall, Theodore R. Scott and Keith V. Rockey of McDougall, Hersh & Scott, Chicago, Ill., Warren S. Adams, 2nd, New York City, and Frank E. Robbins of CPC International, Inc., Englewood Cliffs, N. J., for plaintiff.

John P. Sinclair of Potter, Anderson & Corroon, Wilmington, Del., W. Philip Churchill and Herbert F. Schwartz of Fish & Neave, N. Y., N. Y., Aaron B. Karas of Standard Brands Inc., New York City, for defendant.

## OPINION

STAPLETON, District Judge:

This patent infringement action seeks enforcement of United States Patent No. 2,950,228. Plaintiff and defendant are Delaware corporations. Jurisdiction is conferred by 28 U.S.C. § 1338(a) and venue by 28 U.S.C. § 1400(b).

In its complaint, CPC International, Inc. ("CPC") alleges that it is the owner of the patent-in-suit and that Standard Brands Incorporated ("Standard Brands"), "has been and still is infringing" it. Defendant's answer, in addition to denying infringement, raises a number of affirmative defenses. Three of these defenses became the subject of a motion for summary judgment or, in lieu thereof, a separate trial. Summary judgment was denied. The motion for a separate trial on the affirmative defenses was granted, however, and a three-day trial ensued.

## I. HISTORY OF THE PATENT.

The patent-in-suit relates to a process for the enzymatic conversion of dextrose (also known as glucose or corn sugar) into levulose (also known as fructose or fruit sugar)—a "sweeter" sugar. The process was developed by Dr. Richard O. Marshall, who was employed by the plaintiff as a research chemist beginning in April 1955. At that time, a method for the conversion of dextrose into levulose using an alkaline catalyst was well known. This process was commercially impractical, however, and an alternative method for the conversion of dextrose to levulose was needed.

Because enzymes (i. e., naturally produced organic catalysts) were known to trigger other types of sugar conversion, research workers had, for some years prior to Marshall's work, been on the look-out for an enzyme which would convert dextrose into levulose. One enzyme which had received special attention was "xylose isomerase"—that is, the enzyme known to be capable of converting the sugar called "xylose" into its sweeter relative "xylulose." Efforts to convert dextrose into levulose with the aid of xylose isomerase were reported in three publications. Two of these publications unequivocally reported negative results.[1] While the third contained data

---

[1] R. M. Hochster and R. W. Watson, 48 Arch. Biochem. and Biophys. 120 (1954), Plaintiff's Exh. 9-E; M. W. Slein, 77 J.Am.Chem. Soc. 1663 (1955), Plaintiff's Exh. 9-B.

which could be read to reflect some production of levulose, it contained as a conclusion that conversion was not achieved.[2]

Dr. Marshall was charged with the task of investigating whether dextrose could be converted into levulose through the use of enzymes. He succeeded in developing an improved analytical technique whereby levulose could be reliably detected in smaller concentrations than previously. Using this improved technique, Marshall demonstrated that dextrose could be converted to levulose through the use of xylose isomerase. These experiments occurred in the latter part of 1955 and the early part of 1956 and resulted in a notebook entry in May of 1956 summarizing his findings.

The first patent application concerning the "Marshall process" (the "parent" application) was filed in the Patent Office on December 24, 1956. It contained five claims. The first claim (as later amended) read as follows:

> Process for converting dextrose to levulose which comprises incubating a dextrose-containing liquor with an enzyme preparation which contains xylose isomerase.

This application was prepared by plaintiff's then patent solicitor, Mildred Oncken. The specification described Marshall's discovery that dextrose can be converted to levulose by means of xylose isomerase, and characterized that discovery as "surprising" since xylose isomerase had been reported by other investigators "to interconvert only D-xylose to D-xylulose".

This parent application was rejected on grounds of obviousness, and despite repeated argument by plaintiff's patent counsel that Marshall's process was patentable over the prior art in view of the fact that the prior art teachings were negative, the Patent Office rejected the parent application a total of three times. The final rejection, which occurred on May 1, 1959, was signed by

A. H. Winkelstein as "Examiner". This final rejection was on the following basis:

> Claims 1 to 5 are rejected as unpatentable over each of Hochster, Slein, Mitsuhashi and Underkofler. The first three references disclose the conversion of D-xylose to D-xylulose by the enzyme xylose isomerase. The reaction is shown to take place at certain functional groups. This reaction occurs at the same functional groups in the compounds of the references as in applicant's compounds. In view of the similar structure of the substances used one compound readily suggests the use of the other. It is deemed to be within the skill of the art and a matter of routine experimentation to substitute D-glucose for D-xylose. Furthermore, Mitsuhashi discloses D-glucose treated with xylose isomerase with the production of fructose.

After this final rejection, plaintiff chose not to press the parent application further and no appeal was taken from the final rejection. On October 22, 1959 the application was expressly abandoned.

On September 1, 1959, however, Miss Oncken filed a Continuation-In-Part application ("the CIP"). Claim 1 of the CIP read as follows:

> Process for converting dextrose to levulose which comprises incubating a liquor containing dextrose at a concentration of at least about 0.2 molar with an enzyme preparation containing xylose isomerase.

This claim was identical with Claim 1 of the parent application except for the addition of the phrase "of at least about 0.2 molar." The fifth paragraph of the specification of the CIP contained the following statements *not contained in the parent application:*

> I now have discovered that enzyme preparations which will convert D-xylose to D-xylulose, i. e., enzyme

2. S. Mitsuhashi and J. O. Lampen, 204 J. Biol.Chem. 1011 (1953), Plaintiff's Exh. 9–C.

preparations containing xylose isomerase, will convert dextrose to levulose provided the dextrose concentration in the solution being treated with the enzyme preparation is above a certain minimum value. Above this value, dextrose is efficiently converted to substantial amounts of fructose; below this value, the amount of fructose formed, if any, is so small as to be immeasurable by ordinary analytical procedures. This is a surprising discovery in view of the fact that it is well known that, in general, the lower the concentration of the substrate in an enzymatic conversion, the higher the efficiency of the enzyme. Presumably the enzyme, at concentrations of dextrose lower than this, does not survive long enough to produce any measurable quantity of fructose. There is no upper limit to the concentration of dextrose which may be used; the reaction mixture may be supersaturated with respect to dextrose or may even contain an excess of undissolved dextrose.

Later in the specifications, in the course of describing the method of applying the invention, the following sentence appeared:

After separation from the growth medium, the enzyme preparation is added to a liquor containing dextrose at a concentration *of at least about 0.2 molar,* and the mixture is incubated until the desired degree of conversion has been obtained. (Emphasis added)

The emphasized portion of this sentence was an addition incorporated into the CIP, the rest of the sentence having appeared in the parent application.[3]

The CIP application was allowed without objection or amendment on March 23, 1960, and the patent-in-suit issued to plaintiff on August 23, 1960. The Notice of Allowance listed A. H. Winkelstein as "Examiner".

No mention was made anywhere in the CIP of an article co-authored by Dr. Marshall and his colleague, Dr. Earl Kooi, entitled *"Enzymatic Conversion of D-Glucose to D-Fructose,"* which had appeared in the April 5, 1957 issue of the Journal *Science.* This article describes a process for converting dextrose to levulose by incubating a liquor containing dextrose with an enzyme preparation containing xylose isomerase. A graph of experimental results is depicted with glucose concentration as abscissa and the amount of fructose produced as ordinate. The glucose concentrations depicted range from a high of 1.2 molar to a low of about .05 molar. Three separate curves were plotted, each curve representing the experimental results for a different incubation period. None of these three curves reveals any value of glucose concentration at which fructose production is abruptly altered—let alone reduced to zero. The curves, which include extrapolations by the authors, indicate in fact that the only point where fructose would not be produced would be the point of zero dextrose concentration.[4]

Soon after the patent issued, events transpired which caused plaintiff to apply for a reissue patent. The second, third and fourth claims of the CIP had listed *Pseudomonas Hydrophila* as an appropriate micro-organism for obtaining the desired enzyme preparation. This assertion was based on Dr. Marshall's having emulated two of the prior researchers (Hochster and Watson) in obtaining micro-organism known as *Pseudomonas Hydrophila* from the National Research Council (of Canada). In the latter part of 1960, however, two other researchers presented a paper in the *Canadian Journal of Microbiology* advising the scientific community that the micro-organisms referred to as *Pseudomonas Hydrophila* in Hochster and Watson's work were not

---

3. The context in which the CIP's new material was set can be best appreciated by reference to the entire specification, reprinted at Appendix A.

4. See graph at Appendix B.

*Pseudomonas. Hydrophila* at all, but were in fact, organisms of the strain *Aerobacter Cloacae.* When Mildred Oncken learned of this development, she prepared and filed an application for a reissue patent. In the oath appended to the reissue application, Dr. Marshall stated his belief that "the letters patent referred to [the patent in suit] are inoperative to a substantial extent, . . the specification thereof is defective and . . . such defect consists particularly in the failure adequately to identify certain of the cultures used and claimed." Dr. Marshall further stated that "the errors which render such patent inoperative to a substantial extent arose from inadvertence and mistake and without any fraudulent or deceptive intention on the part of the applicant." On June 29, 1961, the reissue application was rejected on the ground that it contained "new matter". Miss Oncken made no attempts to challenge the rejection but rather allowed the application to become abandoned for lack of prosecution.

No further action with respect to the reissue application was taken until February 18, 1971, when plaintiff's then patent counsel filed a consent-to-public-access with the Patent Office. At no time prior to the commencement of this action did plaintiff ever file a public disclaimer with respect to the second, third and fourth claims of the patent-in-suit.

## II. THE VALIDITY OF CLAIMS 2, 3 AND 4 AND THE EFFECT OF CPC'S FAILURE TO DISCLAIM.

Claims 2, 3 and 4 of the patent-in-suit provide:

2. Process according to claim 1 wherein the enzyme preparation is derived from *Pseudomonas* grown in a nutrient medium containing D-xylose.

3. Process according to claim 2 wherein inhibitors are present during the conversion.

4. Process according to claim 1 wherein the enzyme preparation is derived from *Pseudomonas hydrophila* grown in a nutrient medium containing xylose.

The parties have stipulated that "the micro-organisms of the type commonly known and correctly classified as *Pseudomonas Hydrophila,* grown in a nutrient medium containing xylose, will not produce an enzyme which will convert dextrose to levulose."[5] Dr. Marshall himself conceded this in the oath submitted with the reissue application. Claims 2, 3 and 4 thus teach results which are unobtainable. It necessarily follows, as Standard Brands contends, that these claims are invalid because not "useful" within the meaning of 35 U.S.C. § 101. H. C. Baxter & Bro. v. Great Atlantic & Pacific Tea Company, 236 F.Supp. 601, 611 (D.Me.1964), aff'd, 352 F.2d 87 (1st Cir. 1965), cert. denied, 384 U.S. 905, 86 S.Ct. 1338, 16 L.Ed.2d 358 (1966).

Standard Brands asks the Court to go further, however, and hold that CPC's failure to disclaim these valid claims during the period between the rejection of the reissue application in 1961 and the filing of the waiver of secrecy in 1971, renders *all* claims of the patent unenforceable. The Court is unwilling to so hold.

Sections 253 and 288 of Title 35 provide, in part, as follows:

Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid. 35 U.S.C. § 253.

Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent Office before the commencement of the suit. 35 U.S.C. § 288.

5. Pre-trial Order, Statement of Admitted Facts, ¶ 9.

Relying on Strong v. General Electric Company, 305 F.Supp. 1084 (N.D.Ga. 1969), aff'd 434 F.2d 1042 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971), Standard Brands argues that claims are invalid "without deceptive intention" within the meaning of the cited statutes only when "made inadvertently or by mistake and . . . promptly disclaimed." *Id.,* 305 F.Supp. at 1088. While the quoted language can be found in the *Strong* case, the Court declines to give it the effect defendant urges.

■ There is nothing in this record to suggest that the original references to *Pseudomonas Hydrophila* in claims 2, 3 and 4 of the parent and CIP applications were other than a good faith mistake. Any holding that the remaining claims are unenforceable would, accordingly, have to rest solely on the failure to disclaim. Such a holding would be inconsistent, however, with the text of the relevant statutes and their legislative history.

The first problem with defendant's argument is the wording of 35 U.S.C. § 288 itself. Section 288 provides only *one* sanction for failure to disclaim—inability to recover costs. The statute thus appears to contemplate situations in which no disclaimer has been filed, yet in which suit may nevertheless be brought. Indeed, if failure to disclaim were to *per se* constitute "deceptive intention", the second sentence of the statute would be superfluous.

The statutory predecessor to Section 288 provided as follows:

Sec. 71. *Suit for infringement where specification too broad.*

Whenever, through inadvertence, accident, or mistake, and without any willful default or intent to defraud or mislead the public, a patentee has, in his specification, claimed to be the original and first inventor or discoveror of any material or substantial part of the thing patented, of which he was not the original and first inventor or discoveror, every such pa-

tentee . . . may maintain a suit at law or in equity, for the infringement of any part thereof, which was bona fide his own. . . . But in every such case in which a judgment or decree shall be rendered for the plaintiff no costs shall be recovered unless the proper disclaimer has been entered at the Patent Office before the commencement of the suit. *But no patentee shall be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer.* 35 U.S.C. § 71 (1946 ed.). (emphasis supplied)

The omission from the present Section 288 of the last sentence of this predecessor statute would appear to indicate a congressional intent to abolish the necessity for disclaimer *as a prerequisite to suit.* And, if the language can be said to leave the issue in doubt, the congressional intent is established beyond cavil by the legislative history. The Senate Report on that portion of the Patent Reform Act of 1952 which became Section 288 states as follows:

The second change [wrought by Section 288] relates to the situation when a patent has two or more claims and one of them may be discovered to be invalid. There is now a provision in the statute under which an invalid claim must be disclaimed without unreasonable delay in order to save the rest of the patent. What delay is unreasonable is presently quite confusing, and the present law does not, as a matter of fact, prevent the patentee from suing again on the invalid claim if he so wishes.

*The bill has eliminated that requirement.* It has left the situation so that if one claim of a patent is invalid, the patentee *may* take it out. He may sue on the remaining claims which have whatever validity they may have on their own merits. That is, one bad claim does not affect the other claims, *unless they are also bad for similar reasons.*

2 U.S.Code Cong. & Admin.News, p. 2401 (82nd Cong., 2d Sess., 1952).

Claims 2, 3 and 4 of the patent are invalid. The failure of CPC to disclaim them does not, however, render the remaining claims of the patent invalid.

## III. CPC'S CONDUCT BEFORE THE PATENT OFFICE.

Standard Brands contends that CPC's prosecution of the CIP before the Patent Office involved fraudulent or inequitable conduct rendering the patent invalid and unenforceable. In support of this contention, it maintains that the new material inserted in the CIP was contrary to fact, was inserted deliberately for the purpose of convincing the patent examiner that the Marshall process was not rendered obvious by the prior art, and did, in fact, cause the issuance of the patent-in-suit.

CPC concedes that there is no critical value of dextrose variable associated with the Marshall process and that a number of statements in the fifth paragraph of the specifications are incorrect. It asserts, however, that the insertion in Claim 1 of the CIP of the phrase "at a concentration of at least about 0.2 molar" was intended to overcome the prior art referenced in the parent application rejection, by arbitrarily limiting the scope of the claim to less than Dr. Marshall's full invention. CPC explains the remainder of the new material—specifically, the fifth paragraph of the specification—as a "garbled" and "clumsy" attempt to explain that Dr. Marshall's invention was "truly surprising" because xylose isomerase has an affinity for xylose as substrate which is vastly greater than its corresponding affinity for dextrose."[6] On the issue of causation, CPC argues that the in-

accuracies of the new material are so self-evident as to be incapable of influencing the action of the patent examiner.

### A. *The Purpose Of The New Material.*

Based upon the file wrapper history of the parent application and upon the wording utilized therein by Miss Oncken, the Court finds it crystal clear that the insertion of the new material in the CIP constituted an attempt to overcome the prior rejections of the Patent Office on grounds of obviousness by claiming that the concentration of dextrose was critical to the operation of the process.

Rightly or wrongly, the Patent Office had rejected the parent application on the ground that the claimed invention was "deemed to be within the skill of the art and a matter of routine experimentation to substitute D-Glucose for D-Xylose." The "negative teaching" aspect of the prior art had been repeatedly pressed upon the Patent Office to no avail.

Following the final rejection, CPC had the option of filing an appeal and pressing its "negative teaching" theory. It chose not to do so. Another available alternative, commonly utilized by patent solicitors in comparable procedural circumstances (when warranted by the facts) was to attempt to overcome the obviousness rejection by showing that some operative condition of the process was critical.[7] The text of the CIP demonstrates that Miss Oncken chose to pursue this latter alternative.

CPC's assertion that the purpose of the new language in claim 1—"at a concentration of at least about .2—molar"

---

6. CPC's Proposed Findings of Fact, at 19. The affinity of an enzyme for any given "substrate"—i. e., material to be chemically converted—may be represented by a number called the "Michaelis constant;" the greater the affinity of the enzyme for any given substrate, the smaller is its Michaelis constant for that substrate (T. 366–368). In the *Science* paper (DX 4), Marshall noted that the Michaelis constant of xylose isomerase for dextrose was 0.5, as against a Michaelis con-

stant for xylose (as reported by Slein, T. 339–340) of 0.0037. Thus the affinity of xylose isomerase for dextrose, being inversely proportional to the Michaelis constant, was reported by Marshall in his scientific paper to be less than one-hundredth as great as the affinity of the same enzyme for xylose.

7. Wolk, CPC's Patent Law Expert, T. 321; Schimmel, Standard Brand's Patent Law Expert, T. 42.

was to distinguish the prior art cannot withstand analysis. The parent application had been rejected on grounds of obviousness. The Court cannot conceive how an arbitrary limitation of the scope of the invention would solve this problem. If the process were obvious through the *entire* range of concentration variable, it would seemingly still be obvious over some "arbitrarily selected" sub-range of that variable. Moreover, the wording of the disputed phrase renders it more susceptible to the interpretation that the claimed invention does not work when the dextrose variable is below about .2 molar than to the interpretation that the inventor is restricting his claim by selecting an arbitrary point.

Assuming, however, that the language of the claim is ambiguous when read in isolation, the new material in the specifications of the CIP removes all doubt as to the intent. The fifth paragraph of the specification expressly states that Dr. Marshall has "now discovered" that xylose isomerase "will convert dextrose to levulose provided the dextrose concentration . . . is above a certain minimum value." "Above this value", the specification goes on, "dextrose is efficiently converted to substantial amounts of fructose; below this value, the amount of fructose formed, if any, is so small as to be immeasurable by ordinary analytical procedures." These representations suggest that there is some substantial discontinuity in the production of levulose associated with the concentration of dextrose—a discontinuity sought to be explained on the theory that below the critical concentration, the enzyme "does not survive long enough." They do not suggest, nor does the Court find any other language in the specification which suggests, comparison be-

tween the affinity of xylose isomerase for dextrose and its affinity for xylose.[8]

When the specifications of the CIP are read together with Claim 1, the conclusion is inescapable that the draftsman meant to convey that dextrose concentration was critical to the process and that production only began to occur in the neighborhood of .2 molar.

## B. *The Falsity Of CPC's Representation To The Patent Office.*

CPC concedes, as it must on the current record, that Dr. Marshall did not discover any discontinuity of production in his process for converting dextrose to levulose. The parent application contains no such suggestion and the *Science* article in fact demonstrates that Dr. Marshall discovered measurable production of fructose with concentrations of dextrose far below .2 molar. Indeed, the record shows that, prior to the filing of the CIP, he found production using a dextrose solution 100 times more dilute than that concentration (i. e., using .002 molar).[9]

## C. *The Knowledge Of CPC's Agents With Respect To Dr. Marshall's Invention.*

Mildred Oncken was the attorney of record and responsible for the preparation and prosecution of all applications relating to the Marshall process. At all relevant times, Miss Oncken was experienced in the handling of chemical patent applications. She was familiar with and had access to Marshall's summary of the invention and Marshall's progress reports summarizing his work in this area from 1955 through the first six months of 1957. Miss Oncken had AB and MS degrees in chemistry and had been admitted to practice before the Patent Office as a patent agent in

---

8. Nor do the representations suggest, as CPC argues, that the discontinuity is one caused by *measurement,* rather than *process,* limitations. This is clear from the language used and also from the fact that the discovery of the discontinuity is said to be "surprising." Certainly, it would not be surprising to find that if one reduced the concentration of one

ingredient of a process drastically enough, a point would be reached prior to point zero at which present technology could not detect production. Dr. French, Standard Brand's Biochemistry Expert, so testified. T. 121–22.

9. Dr. Hehre, CPC's Microbiology Expert, at T. 375.

1946. During the period from before 1950 to 1966 she served as the head of plaintiff's Patent Department.

The article which was published in *Science* was reviewed by plaintiff's research department, including Dr. A. L. Elder, the head of that department, and its publication was specifically approved by Miss Oncken. In connection with the prosecution of the parent Marshall application and the preparation of the Marshall CIP application, Miss Oncken had available as consultants, and probably consulted with, Dr. A. L. Elder and Dr. E. R. Kooi, each of whom was familiar with the information given in the article published in *Science*.

Dr. Marshall left CPC's employ in September. of 1957, and thereafter all communications between him and Miss Oncken were by written correspondence. Unfortunately, most of the correspondence with respect to the CIP has been destroyed. Miss Oncken professes virtually no recollection concerning the preparation of the CIP or her communications with Dr. Marshall about it. While Dr. Marshall's memory has faded on a number of points, he does concede that the new material in the CIP specification "was badly worded to the point of being inaccurate to one reading it for the first time," [10] and indicates that he had made suggestions to Miss Oncken for changes in portions of the CIP prior to its filing.[11] These changes, according to Dr. Marshall, were "by and large" not made.[12]

This evidence concerning the communications between Dr. Marshall and Miss Oncken indicates that she was aware that the new material in the CIP was not wholly accurate. Arguably, it does not alone clearly establish that she was aware of the falsity of the "discontinuity" or "criticality" concept, but the Court believes this deficiency is made up by other facts in the record.

As noted, Miss Oncken had a Master's degree in chemistry. She had approved publication of the *Science* article and was familiar with it at the time of the preparation of the CIP application. Miss Oncken indicated her awareness of that article at the critical time when she testified that she did not call it to the attention of the Patent Office because she did not "think it was a relevant reference."[13] During her testimony, Miss Oncken was asked whether she would agree that the graph in the *Science* article indicated "that isomerization occurs in the presence of xylose isomerase regardless of the concentration of glucose." She replied that "she would agree." She further agreed that the graph indicated that the presence of fructose was detected when the glucose concentration was as low as .05 molar.[14]

■ The Court has already found that there was no basis in fact for the representation of the CIP that the concentration of dextrose was critical to the process. The Court also finds, based on Miss Oncken's familiarity with the *Science* publication and her demonstrated ability to understand its import, that Miss Oncken was aware of the falsity of this representation when it was made.

D. *The Relationship Between The Misrepresentation And The Issuance Of The Patent.*

CPC's final argument is that Standard Brands has failed to establish the materiality of any misrepresentations which may have been made to the Patent Office. It maintains that no evidence of record suggests a causal connection between any misrepresentation and the issuance of the patent. In the absence of such evidence, CPC suggests the more likely inference from the circumstances is that two different patent examiners,

---

10. Deposition of Dr. Marshall, Defendant's Exhibit 6, at 103.

11. *Id.* at 116.

12. *Id.*

13. T. 209.

14. T. 225–27.

both under Mr. Winkelstein's supervision, examined the parent application and the CIP, and that the examiner of the CIP, recognizing the patentability of Dr. Marshall's process as presented in the parent application, corrected his predecessor's error by causing the patent to be issued on the CIP. This theory is supported, it is urged, not only by what CPC claims to be the obvious patentability of the process as set forth in the parent application, but also by testimony which CPC purports to summarize in its Proposed Findings of Fact as follows:

(1) Any skilled reader would recognize as meaningless or inaccurate the sentence in which it is said that "the lower the concentration of the substrate the higher the efficiency of the enzyme."

(2) All enzymologists are aware that the reaction between an enzyme and its positive substrate is going to take place no matter whether measureable and no matter how dilute the substrate may be.[15] and

(3) Any skilled reader . . . would know that the "certain minimum value" referred to . . . was not a fixed, specific numerical concentration, since the minimum concentration at which conversion would be detected in a given experiment would vary widely, depending on parameters such as time, analytical method, solution, temperature, pH, and enzyme concentration.[16]

As other courts have noted, it is difficult to prove that a patent would not have issued but for a particular representation or concealment.[17] Nothing is written by the examiner when he acts favorably on an application, and he is not normally available as a witness.[18] The proponent of a claim of materiality is thus necessarily relegated to such circumstantial evidence of causation as may be contained in the file wrapper. As discussed more fully hereafter, one consequence of this fact is that the courts, motivated by the necessity of maintaining the integrity of the patent process, have been willing to hold patents unenforceable without a showing of "but for" cause. This case, however, is one of those unusual ones in which the file wrapper provides clear and convincing evidence of causation.

■ As previously noted, this is a case in which the parent application had been rejected on three occasions as obvious from the prior art. In this context, a CIP was filed. Claim 1 of that application, when read together with its specifications, was clearly intended as a claim that dextrose concentration was critical to the process described. In the normal and ordinary course of the prosecution of patents in the Patent Office, if a critical value is asserted for a particular concentration, the invention involved is considered to be an unobvious contribution and, therefore, patentable.[19] The representation of criticality made in this instance is concededly something that would be a "surprising" discovery. In these circumstances, by far the most reasonable conclusion is that the Patent Office approved the application on the very theory of patentability which was expressly advanced in the CIP application itself.

CPC's explanation for the issuance of the patent is a conceivable, though in the Court's judgment a highly unlikely, one. The testimony indicates that Mr. Winkelstein, during the relevant period, was a "Chief Examiner" and that others under his direction might have been more intimately involved in

---

15. CPC's Proposed Findings of Fact ¶ 38(b).

16. CPC's Proposed Findings of Fact ¶ 38(d).

17. See e. g., SCM Corporation v. Radio Corporation of America, 318 F.Supp. 433, 448–449 (S.D.N.Y.1970).

18. Id.

19. Schimmel at T. 42.

the processing of the parent and CIP applications. CPC's expert, though conceding no knowledge of what happened in this particular case, went so far as to suggest that Mr. Winkelstein's consideration of this matter may have been perfunctory. The Court is willing to accept as a fact that Mr. Winkelstein was acting in a supervisory capacity. It is not, however, willing to accept on this record that Mr. Winkelstein did not read and exercise his own judgment in each instance. Accordingly, the Court is unwilling to conclude that the fact of Mr. Winkelstein's supervisory status renders the clear inferences to be drawn from the file history less than compelling.

CPC's theory that any skilled examiner would have perceived inaccuracy, inconsistency and confusion in the new language of the CIP specifications, would have rejected the claim of criticality, and would have approved issuance of the patent on the basis of patentability asserted in the parent application seems to the Court a very unlikely one.[20] An assertion of criticality was in fact made in the CIP.[21] A patent examiner is not equipped to make independent determinations. Of necessity, he must accept representations made to him unless he has before him something which questions the validity of those representations.[22] Since he is charged with responsibility in an area where the unexpected is the expected, instances in which an examiner rejects an express claim of criticality solely on the ground that it is inconsistent with previously held notions in the field must be rare.[23] Rarer still must be those instances where an examiner rejects an express claim of criticality on such a ground, and without comment or question, approves the issuance of a patent on a basis of patentability other than that asserted in the application.

It seems to the Court that when the examiner studied the CIP, there were two avenues open to him: (1) he could accept the truth of the claim that dextrose concentration was critical to the operation of the process; or (2) he could reject that claim if he had substantial reason to doubt its truth and ask for verification. The file history shows that the examiner approved the issuance of the patent without question

20. The Court notes that it interprets the testimony somewhat differently than does CPC. With respect to the three propositions which CPC maintains in its Proposed Findings would have been recognized as false by a skilled patent examiner, the Court reads the testimony as indicating that a *skilled enzymologist* would have had these perceptions. The record contains no evidence which indicates whether or not this degree of specialization on the part of the examiner is to be expected. With respect to CPC's third proposition, assuming that a skilled chemist would not expect a single numerical figure to represent the critical concentration under all possible circumstances, "at least about .2 molar" denotes some degree of variation and Dr. French testified that a change in the variables referred to by CPC "might change" the specific concentration "a little bit." T. 161. Given the presentation in the CIP, the Court does not believe that any expectation a patent examiner might have had about the effect of other variables would have caused him to interpret it as not asserting the criticality of dextrose concentration.

21. If a different subordinate studied the CIP, the Court finds it very unlikely that he would have done so without reviewing the file wrapper of the parent application. He thus would have been familiar with the entire context which has led the Court to construe the CIP as asserting the criticality of dextrose concentration.

22. Schimmel at T. 42. Charles Pfizer & Co. v. FTC, 401 F.2d 574, 579 (6th Cir. 1968), cert. denied, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969).

23. CPC relies on the testimony of its expert enzymologist, Dr. Hehre, in support of the proposition that anyone skilled in the art would have known that the reaction would take place no matter how dilute the dextrose concentration. The import of his testimony was, [t]here is no discontinuity as far as anyone knows in that situation." T. 365. The Court credits this testimony to the extent it indicates that the claim of the CIP was false. It does not convince the Court, however, that the claim of criticality would have been rejected by a skilled examiner as self-evidently false.

or comment and, accordingly, that he adopted the former course.

■ Standard Brands has thus established that CPC's representations to the Patent Office were material in the sense that the patent-in-suit was issued in reliance upon them. Even in the absence of such a finding, however, it is this Court's view that Standard Brands would be entitled to judgment.

In SCM Corporation v. RCA, 318 F.Supp. 433 (S.D.N.Y.1970), Judge McLean was confronted with a situation in which RCA had withheld relevant information from the Patent Office. On the record before him, however, he could only speculate as to "what position the examiner would have taken had RCA been candid with him." Judge McLean held that the patent was unenforceable, reasoning as follows:

Under these circumstances, I am compelled to conclude that SCM has failed to carry the burden of proving that RCA's nondisclosure was material in a "but for" sense, i. e., that the patent would not have issued if RCA had revealed all the relevant information. . . .

This conclusion, however, does not dispose of the matter. We still have to deal with the doctrine of "unclean hands" . . . .

There is broad language in several decisions to the effect that a patent is affected with a public interest, that complete candor and full disclosure is required of a patent applicant in his dealings with the Patent Office, and that any inequitable conduct on the part of the applicant in obtaining a patent will be sufficient to dissuade a court of equity from rendering him its aid in enforcing the patent against infringers. [citations omitted].

These decisions do not appear to require a finding that the inequitable conduct had a "but for" effect on the granting of the patent as a prerequisite to a court's refusal to enforce it.

Judge Wright was concerned with this problem in Corning Glass Works v. Anchor Hocking Glass Corp. [253 F.Supp. 461 (D.Del.1966)]:

"Even though misrepresentations made to the Patent Office are not legally material to the issuance of a patent, nevertheless, this Court, being a court of equity, can and should refuse to enforce the patent if the Court finds the patentee made intentional misrepresentations to the patent examiner, i. e., if the patentee came into the court with unclean hands. The proceeding before the patent examiner is ex parte and an examiner has no way, in many cases, to ascertain the truthfulness of the representations made to him. Necessarily he must rely on the good faith of the applicant. Absolute honesty and good faith disclosure is necessary." 253 F.Supp. at 470.

I agree with this statement. It fits the present case. No one can tell with certainty what would have happened if RCA had dealt fairly with the Patent Office. But the fact remains that RCA did withhold relevant facts. Which side in this litigation is to suffer from this conduct? It is appropriate that it should be RCA who suffers. Any other rule would fail adequately to discourage conduct of this sort merely because of the circumstance, which must be present in many cases, that it turns out to be impracticable to ascertain what the Examiner, who did not know the true facts, would have done if he had known them. The evidence here justifies the conclusion that this court should not enforce a patent obtained under these circumstances. I so hold.

318 F.Supp. at 449–450.

While the present case does not primarily involve the withholding of rele-

vant information,[24] the *SCM* rationale is applicable. The affirmative misrepresentations made to the Patent Office about a critical value of dextrose concentration were matters which the examiner would be called upon to consider in evaluating the merits of the application. They concerned facts relevant to an application of a statutory requirement for patentability—that the "subject matter as a whole" not be obvious from the prior art. See 35 U.S.C. § 103. In such circumstances, materiality in the sense of "but for" cause need not be shown; the relevance of the misrepresentation to a "statutory criterion" of patentability is sufficient. Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 73 (3rd Cir. 1972); SCM v. RCA, *supra*, 318 F.Supp. at 449; Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 470–471 (D.Del.1966), reversed in part, 374 F.2d 473 (3rd Cir. 1967), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967).

In summary, the Court concludes that defendant Standard Brands has established the following facts by clear and convincing evidence:

1. False assertions of criticality were incorporated into the CIP by plaintiff's patent solicitor;

2. These assertions of criticality were made with full knowledge that they were contrary to Dr. Marshall's experimental results and with the intention of influencing the action of the Patent Office;

3. These assertions involved matters relevant to a determination of the Marshall process's obviousness or lack thereof under 35 U.S.C. § 103;

4. Without the assertions of criticality the examiner would not have caused the patent to be issued.

■ These findings bring this case well within the ambit of Monsanto Corp. v. Rohm & Haas Corp., 456 F.2d 592 (3rd Cir. 1972), cert. denied, 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 158 (1972) and, accordingly, defendant Standard Brands is entitled to judgment. See also Chromalloy American Corp. v. Alloy Surfaces Co., 339 F.Supp. 859, 872–876 (D.Del.1972); SCM v. RCA, *supra*.[25]

## IV. ATTORNEYS' FEES.

■ Standard Brands asserts that it is entitled to reasonable attorneys' fees, arguing that the case is an "exceptional one" within the meaning of 35 U.S.C. § 285. The Court concurs. An award of attorneys' fees is appropriate. See Monolith Portland Midwest Company v. Kaiser Aluminum & Chemical Corporation, 407 F.2d 288, 295 (9th Cir. 1969); Etten v. Lovell Manufacturing Company, 225 F.2d 844, 849 (3rd Cir. 1955); Chromalloy American Corporation v. Alloy Surfaces Company, 353 F.Supp. 429, 431 (D. Del.1973); Mueller Brass Company v. Reading Industries, Inc., 352 F.Supp. 1357, 1380 (E.D.Pa.1972), aff'd 487 F.2d 1395 (3rd Cir. 1973).

Submit order.

---

24. While CPC did withhold relevant information in the form of the *Science* article, the Court believes this adds little to the finding of an affirmative misrepresentation in the CIP.

25. Standard Brands' third affirmative defense claims that a statutory bar exists under 35 U.S.C. § 102(b). The argument is that the *Science* article, fully disclosing Dr. Marshall's discovery, was published more than a year prior to the filing of the CIP and that the CIP is not entitled to the earlier filing date of the parent application because no mention is therein made of the dextrose concentration's being critical. While the matter is academic in view of the Court's holding on Standard Brands' other affirmative defenses, the Court finds this argument to be without merit. If the invention claimed in the CIP is taken to include the criticality of dextrose concentration, as the argument assumes and as this Court finds, the *Science* article cannot constitute a statutory bar since, as the Court finds, no criticality is therein disclosed.

# United States Patent Office

**2,950,228**
Patented Aug. 23, 1960

1

**2,950,228**

**ENZYMATIC PROCESS**

Richard O. Marshall, Muscatine, Iowa, assignor to Corn Products Company, New York, N.Y., a corporation of Delaware

No Drawing. Filed Sept. 1, 1959, Ser. No. 837,348

5 Claims. (Cl. 195—66)

This invention relates to the conversion of dextrose to levulose. More particularly it relates to the formation of levulose in dextrose-containing liquors, e.g., hydrolyzates of starch, through the action of enzymes.

It has been long known in the art that dextrose can be converted to levulose by heating solutions of dextrose in the presence of an alkaline catalyst. The product of such a reaction includes, in addition to the desired levulose, other substances which impart to the final product, usually a syrup, objectionable flavor and color. Although improvements in the art, e.g., U.S. 2,354,664, U.S. 2,746,889, have been made which minimize the formation of objectionable by-products, such processes have never been practiced commercially due to their high cost of operation and to the poor quality of the product.

An object of the present invention is to provide through the use of an enzyme a novel process for the conversion of dextrose to levulose. A further object is to provide a process for the formation of levulose in dextrose-containing liquors, particularly those obtained by acid or enzymatic hydrolysis of starch, without simultaneous production of undesirable side-reaction products. A further object is to provide a process for making a sweeter syrup than those produced from corn or other starches. Other objects will appear hereinafter.

I have discovered that dextrose can be converted to levulose by means of enzyme preparations which convert D-xylose to D-xylulose. This is a most surprising discovery in view of the findings and statements of other investigators. Enzymes are known which catalyze the interconversion of specific sugars which are structurally related through the first four carbon atoms; however, none of these has been reported to convert dextrose to levulose. For example, Mitsuhashi and Lampen (J. Biol. Chem., 204, 1011 (1953)), Hochster and Watson (Arch. Biochem. Biophys., 48, 120 (1954)), and Slein (J. Am. Chem. Soc., 77, 1663 (1955)) obtained enzyme preparations from *Lactobacillus pentosus, Pseudomonas hydrophila,* and *Pasterurella pestis,* respectively which were capable of catalyzing the isomerization of D-xylose to D-xylulose. In each case, these investigators reported that the enzyme preparations which converted D-xylose to D-xylulose did not convert D-glucose to D-fructose.

I now have discovered that enzyme preparations which will convert D-xylose to D-xylulose, i.e., enzyme preparations containing xylose isomerase, will convert dextrose to levulose provided the dextrose concentration in the solution being treated with the enzyme preparation is above a certain minimum value. Above this value, dextrose is efficiently converted to substantial amounts of fructose; below this value, the amount of fructose formed, if any, is so small as to be immeasurable by ordinary analytical procedures. This is a surprising discovery in view of the fact that it is well known that, in general, the lower the concentration of the substrate in an enzymatic conversion, the higher the efficiency of the enzyme. Presumably, the enzyme, at concentrations of dextrose lower than this does not survive long

2

enough to produce any measurable quantity of fructose. There is no upper limit to the concentration of dextrose which may be used; the reaction mixture may be supersaturated with respect to dextrose or may even contain an excess of undissolved dextrose.

To apply the invention, an enzyme preparation is obtained which will actively convert D-xylose to D-xylulose. The source of the enzyme preparation is unimportant, but one convenient means of obtaining such a preparation is by the growth of *Pseudomonas hydrophila* on a nutrient medium containing xylose. The nutrient medium may be such as the one described by Hochster and Watson. After separation from the growth medium, the enzyme preparation is added to a liquor containing dextrose at a concentration of at least about 0.2 molar, and the mixture is incubated until the desired degree of conversion has been obtained. Thereafter, the liquor is refined and concentrated in conventional manner to provide either a syrup or crystalline levulose.

Depending on the source of the enzyme preparation and on the materials present in the enzyme preparation, it may be possible to increase the rate of reaction by the addition of activators such as magnesium or manganese ions. It may be possible in some cases to minimize side reactions by addition of inhibtors such as sodium arsenate, sodium arsenite, and sodium fluoride. In cases where the pH value at a constant level by continuous or periodic the enzyme preparation contains acid-forming reactants, it will be desirable to buffer the system, or to maintain neutralization. Data are presented in Table I which show the effect of pH and temperature on the formation of levulose in a solution containing 3.6 grams per 100 ml. of dextrose. Although it is obvious that the reaction can be conducted over a wide range of pH and temperature values, the optimum pH for the action of an enzyme preparation derived from *Pseudomonas hydrophila* was found to be about 8.5 and the optimum temperature was found to be about 40° C. to about 45° C.

### TABLE I

[Micromoles levulose formed per hour per 100 mg. enzyme preparation.]

| pH | 35° C. | 40° C. | 45° C. | 50° C. |
|-----|-----|-----|-----|-----|
| 7.5 | 29.8 | 44.7 | 39.0 | 12.6 |
| 8.0 | 36.0 | 56.0 | 58.0 | 25.8 |
| 8.5 | 34.0 | 58.0 | 62.0 | 44.7 |
| 9.0 | 30.0 | 58.0 | 56.0 | 15.9 |

The following examples will illustrate the manner in which my invention may be applied. They are for illustrative purposes only and are not to be construed as limiting my invention. All enzyme preparations employed in the examples were obtained from bacterial cells grown in the nutrient medium described by Hochster and Watson (Arch. Biochem. Biophys., 48, 120 (1954)).

### Example 1

*Pseudomonas hydrophila* was grown in the above-mentioned nutrient medium containing D-xylose as the major source of carbon. The cells were harvested by centrifugation, washed and freeze-dried. The freeze-dried cells (5 grams) were incubated at pH 8.0 and 40° C. with 90 grams of dextrose, 0.015 mole of $Na_2HAsO_4$ and 0.0025 mole of $MgCl_2$ in a volume of 500 ml. After 40 hours, 33 percent of the dextrose had been converted to levulose. The mixture was deproteinized by the addition of 100 ml. of 0.5 M $HClO_4$ and centrifuged. The supernatant liquor was deionized by passage over appropriate ion-exchange resins. The deionized liquor was then concentrated to approximately 30 percent dry substance to yield a practically colorless levulose-bearing syrup containing 66 percent dextrose and 33 percent

**2,950,228**

**3**

levulose. Levulose was isolated from the syrup as the calcium levulosate. Calcium was removed as the oxalate and levulose was crystallized from aqueous ethanol. The product, obtained in 18 percent yield based on the initial dextrose, had the following properties:

$[\alpha]_D^{20°} = -91.8$ (Lit.$=-92.0°$). M.P.$=101-103°$ C. (Lit.$=102-104°$ C.).

#### Example II

This example illustrates conversion by a cell free enzyme preparation.

A mixture containing the following final concentrations of components: dextrose, 18 g./100 ml.; arsenate buffer (pH 8.0), 0.05 M; $MgCl_2$, 0.05 M; and a freeze-dried sonic extract of xylose-grown *Pseudomonas hydrophila* cells; 20 mg. per ml.; was incubated at 40° C for 73 hours. At the end of this period, the mixture was deproteinized with 0.5 M $HClO_4$. Upon analysis for levulose by the cysteine-carbazole method of Dische and Bohrenfreund, J. Biol. Chem., 192, 583 (1951), it was found that 24 percent of the dextrose present had been converted to levulose.

#### Example III

This example illustrates conversion of dextrose to levulose in the absence of inhibitors.

A mixture containing the following final concentrations of components: dextrose, 36 g./100 ml.; $NaHCO_3$, 0.02 M, $MgCl_2$, 0.005 M; and 10 mg. per ml. of freeze-dried cells of xylose-grown *Pseudomonas hydrophila* was incubated at 40° C. After 43 hours the mixture was deproteinized with 0.5 M $HClO_4$. Upon analysis for levulose by the cysteine-carbazole method of Dische and Bohrenfreund (J. Biol. Chem., 192, 583 (1951)), it was found that 11.1 percent of the dextrose present had been converted to levulose.

#### Example IV

This example illustrates conversion of dextrose to levulose by means of a xylose-grown member of the genus Bacillus.

A mixture containing the following final concentrations of components: dextrose, 18 g./100 ml.; arsenate buffer (pH 8.0), 0.05 M, $MgCl_2$, 0.01 M; and 10 mg. per ml. of freeze-dried cells of a xylose-grown Bacillus isolated from laboratory air was incubated at 40° C. After 42 hours the mixture was deproteinized with 0.5 M $HClO_4$. Upon analysis for levulose by the cysteine-carbazole method of Dische and Bohrenfreund (J. Biol. Chem., 192, 583, (1951)), it was found that 36 percent of the dextrose present had been converted to levulose.

**4**

#### Example V

This example shows how additional cultures which form xylose isomerase may be obtained, and the application of enzyme preparations from these cultures to the isomerization of dextrose.

Media composed of the following:

| | g. |
|---|---|
| Xylose | 30.0 |
| $NaNO_3$ | 3.0 |
| $K_2HPO_4$ | 1.0 |
| $MgSO_4.7H_2O$ | 0.5 |
| KCl | 0.5 |
| $FeSO_4.7H_2O$ | 0.01 |
| Water to 1000 ml. | |

were inoculated with samples of soil from various sources. The inoculated media were incubated in shake flasks at 30° C. Transfers to successive flasks of the same medium were made at 2 to 4 day intervals. After the sixth successive transfer, the cultures were plated on nutrient agar medium containing 1 percent xylose. Transfers were made from well-isolated colonies to nutrient agar slants. Freeze-dried cells were obtained from these cultures in the manner described in Example I. The preparations were then tested for xylose isomerase activity and for their ability to convert dextrose to levulose. In each case, cell preparations which contained xylose isomerase activity were able to convert 0.2 molar dextrose solution to substantial amounts of levulose. In each case where the cell preparations were devoid of xylose isomerase activity, no conversion of dextrose to levulose was obtained.

This application is a continuation-in-part of application Serial Number 630,025, filed December 24, 1956.

I claim:

1. Process for converting dextrose to levulose which comprises incubating a liquor containing dextrose at a concentration of at least about 0.2 molar with an enzyme preparation containing xylose isomerase.

2. Process according to claim 1 wherein the enzyme preparation is derived from Pseudomonas grown in a nutrient medium containing D-xylose.

3. Process according to claim 2 wherein inhibitors are present during the conversion.

4. Process according to claim 1 wherein the enzyme preparation is derived from *Pseudomonas hydrophila* grown in a nutrient medium containing xylose.

5. Process according to claim 1 wherein the enzyme preparation is derived from a xylose-grown member of the genus Bacillus.

No references cited.

---

## Appendix B

Reprinted from Science, April 5, 1957, Vol. 125, No. 3249, pages 648–649.

### Enzymatic Conversion of D-Glucose to D-Fructose

Xylose isomerase, which catalyzes the interconversion of D-xylose and D-xylulose, has been demonstrated in extracts of xylose-grown cells of *Pseudomonas hydrophila* (1), *Lactobacillus pentosus* (2), and *Pasteurella pestis* (3). Although it has been reported that other aldose-ketose isomerases (4, 5) isomerize series of structurally related aldoses, xylose isomerase has been described as unable to act on aldoses other than D-xylose. However, experiments in these laboratories have shown that sonic extracts and washed, lyophilized cells of xylose-grown

*Pseudomonas hydrophila* (N.R.C. 491 and 492) (1) do in fact convert D-glucose to D-fructose. Similarly, 6-deoxy-D-glucose was converted to a 'sugar that readily reacted in the cysteine-carbazole test (6) and exhibited an $R_f$ in paper chromatography substantially greater than that of 6-deoxy-D-glucose. It seems reasonable to assume that the sugar formed is 6-deoxy-D-fructose (5).

The ability of the enzyme preparations to isomerize D-xylose or D-glucose is a concomitant of growth in the presence of D-xylose as the major carbon source. Growth on D-glucose, D-fructose, or maltose gives rise to cells which are essentially devoid of isomerase activity

for either D-xylose or D-glucose.

The formation of D-fructose as a function of incubation time and initial D-glucose concentration is illustrated by Fig. 1. The data indicate that the affinity of the enzyme for D-glucose ($K_m = 0.5M$ at pH 8.0 and 40°C) is much lower than that reported for D-xylose ($K_m = 3 \times 10^{-3}M$ at pH 7.5 and 30°C, 3). The pH and temperature optima determined at 0.2M D-glucose concentration are about 8.5 and 42° to 43°C, respectively. The conversion can readily be demonstrated in the presence of a variety of buffer systems; however, the addition of arsenate or fluoride, which presumably block competing reactions, leads to an increased

accumulation of D-fructose. Present evidence suggests a requirement for either magnesium or manganese ions, as is the case with xylose isomerization (*1, 3*).

The formation of D-fructose in the system was confirmed by isolation and characterization of the product. In a typical experiment, 90 g of D-glucose was dissolved in 500 ml (final volume) of $0.03M$ arsenate buffer ($p$H 8.0) containing 2.5 mmole of $MgCl_2$ and 5.0 g of lyophilized, xylose-grown *Pseudomonas hydrophila* cells. After incubation in a closed flask for 48 hours at 40°C, the mixture was analyzed as described in the legend for Fig. 1 and found to contain 29.2 g of D-fructose. The mixture was then deproteinized with 100 ml of $0.5M$ $HClO_4$ and centrifuged. The supernatant was deionized by passage over columns of Nalcite HCR and of Duolite A-3 resins; the effluent ($p$H 5.0) was concentrated in a vacuum to approximately 30 percent dry substance. D-Fructose was isolated from the resulting syrup as the insoluble calcium complex. Calcium was removed as the oxalate, and the D-fructose was crystallized from aqueous ethanol. The product, obtained in 18-percent yield based on initial D-glucose, had the following properties: $[\alpha]_D^{20} = -91.8°$ (lit. $= -92.0°$); mp $= 101$ to $103°C$ (lit. $= 102$ to $104°C$).

Although the role of xylose isomerase in the dissimilation of xylose has been

Fig. 1. Formation of D-fructose as a function of incubation time and initial D-glucose concentration. The final concentrations of the components of the incubation mixtures were as follows: arsenate buffer ($p$H 8.0), $0.05M$; $MgCl_2$, $0.01M$; washed lyophilized cells of *Pseudomonas hydrophila* (N.R.C. 492), 10 mg/ml; and D-glucose as indicated. Final volume was 2.0 ml, and the incubation temperature was 40°C. The reaction was stopped by withdrawing 0.25-ml aliquots into 4.75 ml of $0.5M$ $HClO_4$. After centrifugation and suitable dilution, fructose was estimated by a modification (*9*) of the cysteine-carbazole test. All values were corrected for the color contributed by D-glucose. The color contributed by the enzyme preparation was negligible.

recognized (*7*), present evidence warrants only speculation on the metabolic significance of the isomerization of other sugars by this enzyme. Further investigations are in progress on the levels of D-glucose isomerizing activity in other species of microorganisms, and on the substrate specificity of the enzyme (*8*).

RICHARD O. MARSHALL
EARL R. KOOI
*George M. Moffett*
*Research Laboratories,*
*Corn Products Refining Company,*
*Argo, Illinois*

**References and Notes**

1. R. M. Hochster and R. W. Watson, *Arch. Biochem. and Biophys.* 48, 120 (1954).
2. S. Mitsuhashi and J. O. Lampen, *J. Biol. Chem.* 204, 1011 (1953).
3. M. W. Slein, *J. Am. Chem. Soc.* 77, 1663 (1955).
4. M. Green and S. S. Cohen, *J. Biol. Chem.* 219, 557 (1956).
5. M. J. Palleroni and M. Doudoroff, *ibid.* 218, 535 (1956).
6. Z. Dische and E. Bohrenfreund, *ibid.* 192, 583 (1951).
7. R. M. Hochster, *Can. J. Microbiol.* 1, 346 (1955); P. K. Stumpf and B. L. Horecker, *J. Biol. Chem.* 218, 753 (1956).
8. The gift of 6-deoxy-D-glucose tetraacetate from N. K. Richtmyer and the preparation of 6-deoxy-D-glucose therefrom by J. P. Shoffner are gratefully acknowledged. Further thanks are due G. C. Holsing for helpful suggestions on the isolation and characterization of D-fructose and to P. L. Gay for technical assistance.
9. Increased precision in the analysis for fructose by the cysteine-carbazole test has been obtained by heating the reaction mixture for exactly 10 minutes at 60°C instead of permitting the color to develop at room temperature.

14 January 1957