**UNITED STATES MOVIDYN CORP.,**
Plaintiff,

v.

**HERCULES INCORPORATED,**
Defendant.

Civ. A. No. 4–71 Civ. 132.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 17, 1975.

D. C. Roylance, Roylance, Abrams, Berdo & Kaul, Washington, D. C., for plaintiff.

Bernard M. Borish, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RUSSELL E. SMITH, Chief Judge.

The pleadings in this case put in issue the validity and infringement of United States Patent 3,408,306 (herein Boylan II).[1] Plaintiff United States Movidyn Corp. (hereafter Movidyn) seeks a declaration of invalidity. Defendant Hercules Incorporated (hereafter Hercules) by cross-pleading seeks an adjudication of validity and a finding of infringement. The case was bifurcated and the antitrust and accounting issues were to await a determination of the issues of validity. The parties, having been advised of the nature of the court's findings and conclusions as to the enforceability of the patent, now agree that the antitrust issue should be decided.

---

1. Application No. 828,051 was filed by Francis J. Boylan, assignor to Hercules, on July 20, 1959. This was followed by filing No. 19,990 on April 5, 1960, which resulted in United States Patent 3,076,768 (Boylan I) on February 5, 1963. Application No. 122,395 was filed July 7, 1961, reciting that it was a continuation of Serial Nos. 828,051 (subsequently abandoned) and 19,990. The Patent Office denied the application for Boylan II on the ground of double patenting. The Board of Appeals of the Patent Office affirmed. The Court of Customs and Patent Appeals reversed, and the patent in suit, United States Patent 3,408,306 (Boylan II), issued on October 29, 1968, to Hercules, the assignee of Boylan.

**1148**

PATENTABILITY—Fact

I find the facts:

In a great many manufacturing processes foaming creates problems and over the course of the years a wide variety of liquids and solids have been used to control it.[2] The wood pulp industry has been plagued with foaming. In the course of making wood pulp, wood chips are cooked in a caustic solution to separate the cellulose fibers from the organic connective material. The product of this cooking is brown stock, and it is necessary to wash the brown stock to separate the cellulose fibers from the spent chemicals and the dissolved organic connective material. The washing is done in a brown stock washer in which the highly alkaline brown stock is agitated at temperatures approaching 100°C. The natural soaps in the brown stock, when agitated, create foam. The foam inhibits the washing and, unless destroyed, creates a bottleneck in the manufacturing process with the result a serious reduction in pulp production. The alkalinity and temperature of the mix in the brown stock washers complicate the defoaming problem. The pulp industry and the suppliers to the industry were aware of the problem and of the need for improved defoaming methods and compositions for use in brown stock washers, but as of the 1950's defoaming the brown stock washers was a problem not satisfactorily solved by existing defoamers.

In 1953 Hercules, then a supplier of chemicals to the pulp industry, assigned Dr. Francis J. Boylan, a physical chemist employed in its large and expensive research center, to work on the development of a defoamer for brown stock washers. Boylan reviewed the literature relating to defoamers and found as others had [3] that very little was known about the "fundamentals of their mode of action." Many defoamers were on the market. Most of them depended on oils and waxes—the fatty acids, the fatty esters, the vegetable and mineral oils, and in later years the organopolysiloxane [4] oils and compositions. It had been thought that foam inhibition, whether resulting from bubble coalescence or bubble rupture, was the result of differential surface tensions rendering the bubble film unstable.[5] Boylan's microscopic examination of defoamers led him to believe that the most efficient defoamers contained colloidal plate-like solid crystals which caused a pitting of the bubble film. He determined that the crystals functioned when one or more of them simultaneously came in contact with the two surfaces of the bubble film creating a weak spot which would readily rupture. The crystal was effective only if it had a relatively high contact angle.[6] The degree of the hydrophobicity of the crystal determines the height of the contact angle.[7]

It was experimentally determined that a small particle was within some limits more efficient than a larger one and that only the surface characteristics of the particle were important. From all of this Boylan concluded that relatively cheap and normally hydrophilic colloidal silicas (silicon dioxide) could be used if their surfaces could be made hydrophobic. Boylan experimented with various particles, oils, and surfactants, and also

2. J. J. Bikerman in collaboration with J. M. Perri, R. B. Booth, and C. C. Currie, FOAMS: Theory and Industrial Applications (1953). Currie of Dow Corning, the inventor in United States Patents 2,595,928 and 2,632,736, and British Patents 689,306 and 639,673, and an authority on foaming, wrote the section on chemical antifoaming agents.

3. Note 2, *supra.*

4. The word "silicone" is sometimes substituted for the word "organopolysiloxane."

5. J. Robinson and W. Woods, National Advisory Comm. Aeronautics, Tech. Note No. 1025 (May 1946).

6. The angle formed between the tangent to the surface of a drop of liquid and a flat surface on which it rests.

7. A hydrophilic (water-loving) particle is one which is easily wet by water; a hydrophobic (water-hating) particle is one which is not easily wet by water.

with various methods of rendering silica particles hydrophobic by the use of organopolysiloxanes. By late 1958 he had largely completed the work which later appeared in the Patents Boylan I and Boylan II.

The Boylan composition was grossly described as "comprising from about 80% to about 97% of certain water-insoluble hydrophobic organic liquids, from about 3% to about 20% of small, solid, normally hydrophilic particles having a hydrophobic surface suspended in the organic liquid and from about 0.5% to about 5% of a surfactant."[8] The method of treating silicas with organopolysiloxane oils to render their surfaces hydrophobic was not new and the dispersion of the antifoam ingredient in organic oil was not new.

Boylan did discover, and this was the heart of his discovery, and it was new, that the solid colloidal particle with a hydrophobic surface was an effective defoaming tool. The organopolysiloxanes were used, not as defoaming agents in themselves, but to render the silica particles hydrophobic. The fact is, and it was demonstrated in court, that hydrophobic surfaces do puncture bubbles. Particles with hydrophilic surfaces may contribute to defoaming by altering surface tension as suggested by Zimmer (United States Patents 2,379,268 and 2,467,177) but they are not effective in the same manner as those with hydrophobic surfaces.

Prior to Boylan the literature did not consider the hydrophobicity of the particle as a defoaming factor.[9] Patents issued prior to Boylan did teach the use of particles in combination with organopolysiloxanes to control foaming. Some of the particles used were hydrophobic, but the patents did not articulate the use of hydrophobic particles, and in all of them the organopolysiloxane oils or compounds were regarded as the effective defoaming agent. The polysiloxanes were not described as being used to render the particles hydrophobic.

Thus Currie (British Patent 639,673, United States Patent 2,632,736) combined a silica aerogel with a viscous methyl siloxane polymer and produced a semi-rubbery polymer which could be dispersed in an organic liquid. Currie used the silica to modify the methyl siloxane and regarded the polymer resulting as the defoaming agent. He did note that the excess silica could be removed by filtration and that the extract thus obtained possessed the defoaming property of the siloxane aerogel grease. The extract thus obtained was composed of hydrophobic silica particles, but Currie did not say so and he did not consider them to be the defoaming agent. The ratio of silica to the silicone employed was about 1 to 5.

Solomon (United States Patent 2,829,112) followed Currie and produced an emulsion employing a mixture of organopolysiloxanes and colloidal silica. His examples indicated a ratio of silica to silicone of 1 to 20. Sullivan (United States Patent 2,894,913), also following Currie, described Currie's use of silica as a filler and stated a preferred range of silica to silicone ratios of 3 to 100 to 7 to 100. Walker and Morrow (United States Patent 2,482,307) used polymeric dimethyl silicones in a defoaming composition. The patent specified "Dow-Corning stopcock grease," "Dow-Corning plugcock grease," "Dow-Corning ignition sealing grease," "Dow-Corning Type 200 fluid," and "Dow-Corning Type 500 fluid." The greases contained silica particles and the fluids did not. The inventors did not distinguish between them and did not mention hydrophobicity. Stamm (German Patents 883,589 and 939,266) claimed a compound containing organopolysiloxanes and described the silica as a stabilizer. Caviet (United States Patent 2,751,358 and British Patent 658,494) used high-melting amine

---

8. Optional if the organic liquid contained polar groups. See United States Patent 3,-408,306.

9. Notes 2 and 5, *supra.*

waxes dispersed in a water-immiscible organic liquid. Bass (Australian Patent 208,685) used silica and dimethylpolysiloxane in a ratio of 1% to 10% of silica, based on the weight of the dimethylpolysiloxane, to control bloat in ruminants, and Austin and Ratcliff (United States Patent 2,635,981) used a substantially similar compound for substantially the same purpose.

John C. Zimmer, an employee of Standard Oil Development Company and a chemist at work in the field, was the inventor named in United States Patents 2,379,268, 2,467,177, and 2,440,489. In his 1942 application for what became United States Patent 2,379,268, Zimmer, who with Caviet recognized the value of particles in defoaming in his patent claims, relied on various waxes which were water-insoluble or substantially water-insoluble. Zimmer stated that the nature of the effect of the particle was not known, but it is clear, not only from his use of a wax which would melt and cease to be hydrophobic at some temperature, but from his designation of useful particles, some of which (e. g., wood flour) are not hydrophobic, that he did not distinguish between the hydrophobic and the hydrophilic particles. Two years later, in the application for what became United States Patent 2,467,177, and while he was still searching for an explanation of the bubble-breaking phenomenon, Zimmer treated as equals for anti-foaming purposes silicone compounds which are hydrophobic and organogermanium compounds which are not. Zimmer obviously did not know that the character of the surface of the particle made a difference.

Following the publication of Boylan I, the defoaming community which, except for Zimmer, had used the particle almost accidentally and which had not recognized the surface characteristic of the particle as important, turned to the hydrophobic particles. Nopco, a competitor, tried to copy Boylan I and was unsuccessful until it procured a copy of the Australian counterpart of Boylan I. Movidyn, seeking to enter the defoamer market, seized on Boylan I and, in an effort to create a defoamer, worked around it. Following Boylan, no less than 11 patents were granted in which the hydrophobic particle was specifically described and recognized as the defoaming agent.[9]

The laboratory tests of the Boylan composition indicated a high degree of effectiveness. Field trials in operating pulp mills were successful and when the Boylan composition (Hercules 340 and its progeny) was put on the market it became an instant success. Sales rose from $122,000.00 in 1960 to $3,000,000.00 in 1970. Very substantial royalties were paid to Hercules by its competitors. Dow-Corning Antifoam A, a composition using the semi-rubbery polymer of Currie, had been used in one pulp mill as a defoaming agent in brown stock washers. The volume used for that purpose was about 15,000 pounds per year. No Antifoam A was sold for use in brown stock washers in 1972 and 1973.

## PATENTABILITY—Law

I conclude as a matter of law or mixed fact and law as the case may be:

Boylan discovered that the solid particle having a hydrophobic surface was an extremely effective defoaming tool. This discovery was not obvious to those with ordinary skill in the art as of the date of Boylan I. 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Care-

---

9. Braitberg, United States Patent 3,567,574, March 2, 1971; Christian and Liebling, United States Patent 3,207,655, Sept. 21, 1965; Buckman, United States Patent 3,528,929, Sept. 15, 1970; Harrison, United States Patent 3,573,222, March 30, 1971; Duval, United States Patent 3,705,860, Dec. 12, 1972; Liebling and Canaris, United States Patent 3,207,698, Sept. 21, 1965; Young, United States Patent 3,634,288, Jan. 11, 1972; Michalski, United States Patent 3,639,260, Feb. 1, 1972; Curtis, United States Patent 3,661,793, May 9, 1972; Hofgesang, United States Patent 3,671,460, June 20, 1972; Lieberman, United States Patent 3,697,442, Oct. 10, 1972.

ful and highly technical articles had been written on the subject without any disclosure of the relationship between the hydrophobicity of a particle and its defoaming effectiveness. A host of patents had been granted, some using hydrophobic particles and some not, but none of them teaching hydrophobicity of the particles as a defoaming factor. Persons learned in chemistry and familiar with the defoaming problem who were actively searching did not discover the use of the hydrophobic particle until Boylan pointed it out. Boylan's discovery permitted a change in direction as revealed by the subsequently issued patents in which the study started with the hydrophobic particle as the effective defoaming agent.

Boylan's basic discovery did more than scientifically explain the use of existing defoamers.[10] It enabled Boylan to produce a defoaming composition which utilized the hydrophobic particle as the primary defoaming agent, which was more effective than existing defoamers in brown stock washers because it was more stable under the conditions of temperature and alkalinity, and which was cheaper than existing silicone defoamers because it reversed the ratio of silica to silicone. The Boylan composition, also because of the reversal of the ratio, provided a greater volume of effective defoaming particles per unit of the defoaming composition.

If the conclusion that Boylan's discovery was that the solid particle with a hydrophobic surface was an effective defoaming tool amounts to an invention is correct, then it follows that Boylan I and II had not been anticipated. 35 U. S.C. § 102. The prior patents taken singly or together simply do not teach that. In United States Patent 2,482,307 (Walker and Morrow 1949), principally relied upon by plaintiff, the hydrophobic solid particle is not described as an element of the invention—it is not even described. By reference to other patents mentioned by Walker and Morrow, it could be determined that the silicone greases used do contain hydrophobic silica particles which are not described as being hydrophobic. As previously indicated, Walker and Morrow did not distinguish between oils containing no silica and the greases containing it. The silicone oil or the silicone grease in the Walker and Morrow patent is the defoamer. In Boylan the particle is the defoamer and the silicone is used to alter its surface characteristic.

■ The rule is that " ' . . . [u]nless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function' in a single prior art reference 'there is no anticipation.' " Walker v. General Motors Corp., 362 F. 2d 56, 58 (9th Cir. 1966). Neither Morrow and Walker nor any other specific reference anticipated Boylan.

■ I conclude, therefore, that Boylan did invent a composition and a method and that the invention in Boylan I and II was patentable.

FRAUD

The file wrapper in Boylan I shows that in November 1960 all claims were rejected as unpatentable over Larsen (United States Patent 2,773,041), Solomon (United States Patent 2,829,112), and Sullivan (United States Patent 2,894,913). An amendment filed in July 1961 represented that "The finely divided silica disclosed in the cited patents (Solomon and Sullivan) is *untreated* and therefore *hydrophilic*." Attached to the amendment was a copy of pages 1389 to 1393 of an article by M. J. Hunter and others which appeared in Vol. 39, Industrial Engineering Chemistry (1947). This article was cited to show that organosiloxane polymers did not render glass (which is largely silica) hydrophobic unless heated at relatively high temperatures, and in support of the thesis that Solomon and Sullivan silicas, which

10. See DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339 (1931).

had not been heat-treated, were hydrophilic. From a table on page 1391 and the text on page 1393 of the article it may be determined that a dimethylpolysiloxane treated with a hydrochloric acid solution becomes a hydroxyl end-blocked dimethylpolysiloxane which will produce a high contact angle without heat treatment. The fact is more clearly stated on pages 1394 and 1395. Sullivan in Example 3 (United States Patent 2,894,913) employs finely-divided silica with a hydroxyl end-blocked dimethylpolysiloxane fluid, and the silica is in fact hydrophobic. The statement that the Sullivan particle was not hydrophobic was untrue and the Hunter article was misrepresented in that it was not fully disclosed and did not support the proposition for which it was stated.

In an interview with the examiner, the defendant brought to his attention British Patent 639,673 (herein British-Currie) which had been cited in opposition to a foreign patent application. The American-Currie patents (No. 252,595,928 and No. 2,632,736) which for any purposes pertinent here were similar to British-Currie, had been cited as references in the Solomon and Sullivan patents but had not been previously mentioned in the Boylan application. At the time of the interview it was represented to the examiner that the heat treatment shown in Currie was not sufficient to render the Currie silica hydrophobic. The statements made during the interview were incorporated in an amendment filed in April 1962.

It was also pointed out that (in order to make absolutely sure) applicant repeated the described heat treatment of the British patent (at 100°C. for 2 hours) using silica aerogel and viscous rubbery methyl siloxane polymer in the ratio called for in the patent. The resulting treated silica was tested and found to be wettable by water, i. e., a sample of the treated silica placed on water immediately began to sink into and become wet by the water. It is obvious, therefore, that the silica of the British patent is not at all similar to applicant's hydrophobic silica.

File Wrapper—United States Patent 3,076,768, p. 38

The fact is that the Currie particles of silica were hydrophobic and the representation as to the tests made by the applicant, while if true, were misleading. Boylan, who at that time had not yet seen British-Currie, received a telephone call from one of the defendant's attorneys handling the patent application. He was requested to immerse silica aerogel in viscous rubbery polysiloxane and heat it to 100° C. and extract the silica and test it for its hydrophobicity. Boylan selected for the experiment the Dow-Corning 200 fluid, which was a viscous, sticky polysiloxane, but which was not treated with silica as in Currie and which did not have the semi-rubbery characteristics described by Currie. Boylan entrusted an assistant to make the test in accordance with the methods described. Beyond that there is no satisfactory evidence as to how the test was conducted. Boylan didn't really know at the time his deposition was taken, some six years after the event, exactly what polymer was used, what silica was used, how the material was heated, or how the particles of silica were finally extracted. If records of the experiment were made, they cannot be found, and there is no identification of the person who did the work.

Subsequently, and prior to the issuance of Boylan II on October 29, 1968, Hercules, from the results of tests made in its own laboratories in 1966 and from the testimony of Dr. Currie, the inventor in British-Currie, given in 1967 in the case of Hercules v. Nopco, a suit involving Boylan I, knew that the Currie particles, both those extracted from the Currie polymer and those remaining in it, were hydrophobic. These facts were not reported to the Patent Office.

I view the other allegations of fraud, i. e., those mentioned in paragraphs 1(c), 1(d), and 1(f) on pages 46 to 48 of plaintiff's post-trial brief, together

with the failure to disclose the Atkins article and the Stamm I and II patents, to be wholly without merit and I find neither fraud nor simple negligence in connection with them.

■ I now consider the state of the Hercules corporate mind as it relates to the misrepresentations made. The first inquiry is whether there was deliberate deception. I find that there was not. The people involved here were able people seriously engaged in honorable professions. Unless it be inferred from the misrepresentations here, there is nothing in the record to indicate any lack of character on their part and there is a presumption that they did not engage in deliberate misconduct. In light of the whole record it does not appear to me that the conduct of Hercules was that of a party bent on deception. It was simply too awkward. Minds seeking to deceive would not have blazed a trial of deception by volunteering British-Currie and then placing in the file wrapper representations about it which could be demonstrated to be false. Had Hercules been aware that the portions of the Hunter article not furnished to the Patent Office provided evidence that the Sullivan, Solomon, and Currie particles could have been hydrophobic, I can't believe that it would have furnished that portion of the article which on its face appears to be but a portion of the whole, leaving the deception to be ferreted out by the first to look at the file wrapper. I think this is particularly so in view of the fact that on the basis of the pages actually furnished an argument could have been made that Boylan knew that the Sullivan particles could have been rendered hydrophobic by a chemically-treated dimethylpolysiloxane.

Boylan was, as previously indicated, a physical chemist, and his invention revolved about the physical effect of the hydrophobic particle. The polysiloxanes were used by Boylan to render his particle hydrophobic. He did not claim anything with respect to the silicone chemistry. Boylan did experiment with heat in the treatment of the silicone oils, and when the commercial defoamer was made, he employed the heat-treating method disclosed in the patent. To Boylan heat was important. At that time silicone chemistry was relatively new and many able chemists trained in the organic or inorganic fields made mistakes when dealing with it. I am not unmindful of the capacity of the human ear to hear what the human mind wants it to hear and the human eye to see what the mind wants it to see, nor of the capacity of the mind to believe what it conceives to be in the self-interest to believe. For too many years have I seen basically honest litigants, lawyers, and judges find in all sorts of documents and opinions only what it advantaged them to find. When Boylan read the Hunter article it is not improbable that the portions relating to the heat treatment of the silicone jumped out at him—confirming his belief. It is not improbable that in reading the Sullivan, Solomon, and Currie patents the lack of language describing a heat treatment loomed so important that he did not seriously consider other language which should have been considered. I look at the evidence bearing on misrepresentation in the light of these considerations.

The evidence shows that the Hercules testing to determine the hydrophobicity of the Currie particles was incredibly sloppy but I do not find that tests were not performed or that the results as Hercules understood them were misrepresented. This being so, there was some excuse for the representations made with respect to Currie.

As indicated, Hercules did discover while Boylan II was pending that the Currie particles were hydrophobic and did not report that discovery to the Patent Office. I do not attribute intentional fraud to this failure. I cannot know who in a position of authority was aware that misrepresentations had been made, who, if anyone, in years later had a memory of them, and who, knowing all, would have thought years later that a duty did arise to advise the Patent Office.

The representations as to Sullivan are more troublesome. Boylan had to know from the text and the claims in the Sullivan patent that some of the silica particles produced according to Sullivan were treated with a dimethylpolysiloxane which had been end-blocked by the trimethylsiloxy groups or the hydroxyl radicals. Boylan knew from his own laboratory work that silica could be rendered "completely hydrophobic" without heat by adding unhydrolized chlorine to the silicone polymer, and he should have known from the Hunter article that a high contact angle could be created by treating a glass surface with hydrochloric acid and dimethylpolysiloxane. Boylan's experence did not justify a conclusion that the end-blocked dimethylopolysiloxane, described by Sullivan, mixed with silica would act the same as an untreated dimethylpolysiloxane. A finding that in all of this there was an intentional fraud would require that Boylan's own laboratory experience with silicone and unhydrolized chloride be related in his mind to Sullivan's treatment of silicone with the trimethylsiloxy groups or the hydroxyl radicals or that Boylan related in his mind the Sullivan chemistry with what appears in the Hunter article with respect to glass, layers of hydrochloric acid, and silicone. With respect to the Hunter article it appears to me that had these relationships, which appear quite as much from the portions of the article furnished as from the whole article, been apparent to Boylan [11] he would not have furnished the article.

■ From all of this I find that Hercules was not guilty of intentional fraud, that Hercules did not represent to the Patent Office as true that which it knew to be false. I also find with respect to the Sullivan patent that Boylan's experience with his (Boylan's) use of chemically untreated dimethylpolysiloxane did not warrant him in equating it with Sullivan's use of end-blocked dimethylpolysiloxane and then concluding that Sullivan's particles could not be hydrophobic in the absence of a heat treatment. Boylan did know from his own experience, and he should have known from the Hunter article, that some chemicals may be substituted for heat in the use of silicone to make silica surfaces hydrophobic, and when he read that at least some of Sullivan's particles were treated with a silicone that had been end-blocked by the trimethylsiloxy groups or hydroxyl radicals, he was fairly warned that Sullivan's particles might be hydrophobic and should then have investigated further before making the false assertion.

I conclude, measuring both the conduct and the causation, that the making of these misrepresentations warrants a refusal to enforce the patents.

■■ In view of the nonadversary nature of Patent Office procedures there is an affirmative duty on an applicant for a patent to be candid in his dealings with the Patent Office. Ignorance may, of course, under some circumstances excuse a misrepresentation. But I believe that where that ignorance is the only excuse for a misrepresentation it is not a sufficient excuse if it appears from all of the circumstances of the case that the party making the representation was fairly warned that it might not be true. Hercules failed in an affirmative duty to investigate further the representations it made to the Patent Office and in my opinion that failure would warrant a refusal to enforce the patent.

Defendant makes a persuasive argument to the effect that the history of the application shows that the examiner, who was learned in the art, was not swayed by the representations as to the hydrophobicity of the Solomon, Sullivan, and Currie particles because he had repeatedly rejected the applications after the representations were made, but rather was swayed by the fact, disclosed late in the proceedings, that the Boylan composition produced new and unexpected results. The fact is, however, that in its last response to advisory action and in

11. I have used Boylan's name to identify the corporate mind. This may be unfair to Boylan.

its brief in support of an appeal from the decision of the primary examiner (the document in the file wrapper immediately preceding the allowance) defendants urged, as they had all along, that the prior references neither *"disclose [n]or suggest the use of hydrophobic silica"* and that *"all* of the silicas specifically named in the primary references were *hydrophilic."* This theme was forcefully repeated in a variety of ways. I do not think that Currie, Sullivan, and Solomon taught hydrophobicity, and I do think that the fact that their particles were hydrophobic was purely accidental. While I am of the opinion that a patent for Boylan I should have issued regardless of whether the particles of Currie, Sullivan, and Solomon were in fact hydrophobic, still the representations made involved facts close to the very core of the invention.

■ In this area of causation, where the subjective processes of the examiners' minds are involved, I conclude as a matter of law that the burden of one seeking to invalidate a patent on the basis of misrepresentation is satisfied once it is shown that a fair chance exists that the examiner might not have granted the patent in the absence of the misrepresentation.

It may be that in this case the examiner, having before him evidence of new and unexpected results, would have come to the conclusion of patentability reached by the court, but I cannot so find, and I do find that there is doubt about what the examiner might have done absent the misrepresentations. See Norton v. Curtiss, 433 F.2d 779, 57 CCPA 1384 (1970); CPC International, Inc. v. Standard Brands Inc., 385 F. Supp. 1057 (D.Del.1974).

■ I conclude that the making of the misrepresentations, measuring both conduct and causation, does not warrant antitrust relief.

The Supreme Court in the threshold case of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, at 176, 86 S.Ct. 347, at 350, 15 L.Ed.2d 247 (1965), made the antitrust laws applicable to monopolies arising out of patents procured by fraud, but in doing so said, "It must be remembered that we deal only with a special class of patents, *i. e.,* those procured by intentional fraud." Mr. Justice Harlan, specially concurring, said at 179, 86 S.Ct. at 351:

We hold today that a treble-damage action for monopolization which, but for the existence of a patent, would be violative of § 2 of the Sherman Act may be maintained under § 4 of the Clayton Act if two conditions are satisfied: (1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent applicant, he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained . . . . .

The rule of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., *supra,* does not embrace the kind of conduct here disclosed.

■ Were there intentional fraud I would still distinguish between the causation required to be shown to warrant a refusal to enforce a patent and that required to be shown to warrant antitrust relief. In the latter case I think that the party seeking antitrust relief should bear the burden of proving, not that a fair chance exists that the patent would not have issued, but that the patent would not have issued but for the fraud. In cases, such as I believe this to be, where an invention which should have been patented was disclosed, it may be difficult to prove causation, whereas in cases where the invention disclosed was not entitled to patent, the proof of causation will be much simpler. Here, as previously indicated, I am unable to find from the evidence that the patent would not have issued absent the misrepresentations. Movidyn has failed to satisfy its burden of proof and is not entitled to antitrust relief.

■ Plaintiff moves for attorney's fees under 35 U.S.C. § 285 and cites in

**1156**

support Kahn v. Dynamics Corp. of America, 508 F.2d 939 (2d Cir. 1974).

The motion is denied.

Viewing the conduct of both parties I do not deem this case to be the "exceptional one" within the meaning of 35 U.S.C. § 285. Movidyn wanted to get into the defoamer business and it wanted to do so by using Boylan's brainchild. If any party ever courted litigation Movidyn did. It sailed a course as close to the periphery of Boylan I as careful legal navigating would allow. The navigation became more hazardous when Boylan II issued. On an obvious collision course with litigation Movidyn made certain of the collision by filing this declaratory judgment action in this forum, a forum having no relationship to the issues or the parties, thereby adding in some measure to the costs of the litigation.

It is ordered that the plaintiff be denied all relief. It is ordered that the defendant be denied all relief. Each party shall bear its own costs. Let judgment be entered accordingly.