**GEMVETO JEWELRY COMPANY, INC., Plaintiff,**

v.

**LAMBERT BROS., INC., Defendant.**

**No. 80 Civ. 5147 (WCC).**

United States District Court,
S. D. New York.

July 13, 1982.

Auslander, Thomas & Morrison, Jarblum & Solomon, P. C., New York City, for plaintiff; M. Arthur Auslander, James D. Fornari, New York City, of counsel.

Kirschstein, Kirschstein, Ottinger & Cobrin, P. C., New York City, Richards, Harris & Medlock, Dallas, Tex., for defendant; Peter T. Cobrin, New York City, Jerry W. Mills, Dallas, Tex., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action for alleged infringement of U. S. patent No. 3,339,378 issued to Francis Chirol of Paris, France ("Chirol") on a process of mounting precious stones and the resulting jewelry articles (the "Chirol patent") is before the Court on defendants'

motion for summary judgment on the ground that the Chirol patent is invalid or unenforceable because of fraud or inequitable conduct in the prosecution of the applications for said patent.

*The relevant facts*

The following facts are undisputed:

Jean Vitau ("Vitau"), founder and president of plaintiff Gemveto, acquired all rights in the Chirol patent by an assignment from the patentee Chirol in 1968, which was duly recorded in the U. S. Patent and Trademark Office ("PTO"). On December 3, 1980, shortly after the present action was brought, Vitau reassigned to plaintiff Gemveto all such rights, including the right to sue for past infringements.

The Chirol patent was issued September 5, 1967 on an application filed June 20, 1966 as a continuation of an earlier application filed June 25, 1964, claiming priority based upon the filing of a corresponding French application on October 16, 1963.

The Chirol patent contains 7 claims which are set forth in full in the margin.[1] Claims 1 and 2 cover the finished jewelry article with the stones in place in the mount; claims 3 and 4, respectively, cover two alternative versions of the mount without the stones; and claims 5, 6 and 7 cover processes of securing the stones in the two types of mount.

Figures 1 through 4 of the Chirol patent drawings illustrate one of the two alternative types of mount and the process for securing the stones therein. In this version, the metal mount is provided at its upper surface with a longitudinal row of closely spaced frusto-conical cavities, with thin, flexible metal securing rods or stirrup members projecting radially from one side of the mount in alignment with the spaces between the cavities. The fixed inner ends of

1. 1. A decorative article comprising a plurality of decorative stones and a supporting mount, said mount being provided with a row of cavities, each cavity receiving an individual stone, and a plurality of stirrup members carried on said mount perpendicular to said row, each stirrup member occupying a plane extending through a zone connecting two adjacent cavities, and simultaneously pressing the stones in said two adjacent cavities in a direction perpendicular to said row which applies said stones into their cavities and in a direction longitudinally of said row which causes each stone to be gripped between two adjacent stirrup members.

2. A decorative article as claimed in claim 1 in which the stones positioned in said cavities have sloping edge portions which extend into said connecting zones and receive the pressure exerted by said stirrups perpendicularly of said row, so that a portion of said pressure is referred through said sloping edge portions longitudinally of said row.

3. A setting for decorative stones, said setting comprising mounting means provided with a row of cavities, each adapted to receive a single stone, and a plurality of rods affixed to said mounting means laterally of said row, each rod being positioned to engage a stone in each of two adjacent cavities when bent transversely across said row.

4. A setting for decorative stones, said setting comprising mounting means provided with a row of cavities, each adapted to receive a single stone, and a plurality of metal loops positioned transversely of said row midway between the centers of adjacent cavities, so that when pressed downwardly toward said mounting said loops will engage the stones in both said adjacent cavities.

5. The process for securing a plurality of decorative stones in a supporting mount provided with a row of cavities, each cavity being adapted to receive an individual stone, which process comprises the steps of positioning one of said stones in each cavity, and retaining said stones in said cavities by means of stirrup members disposed on the mount perpendicular to said row, each stirrup member occupying a plane extending through a zone connecting two adjacent cavities and exerting simultaneously on the stones in said two adjacent cavities a pressure in a plane perpendicular to said row which applies said stones in their cavities, and a pressure acting longitudinally of said row which serves to grip each stone between two adjacent stirrup members.

6. The process claimed in claim 5 according to which each stirrup member consists of a rod initially secured at one end laterally of said row, and in which said rods are successively bent, tightened in said zones onto said stones and brazed at their other ends to said mount.

7. The process claimed in claim 5 in which said stirrups are first formed on said mount with both ends attached to said mount and sufficient space between each pair of adjacent stirrups to admit a stone, said stones are subsequently inserted between said stirrups, and said stirrups are then forced toward the mount until they grip the stones.
No references cited.

the rods or stirrup members are secured to one side of the mount, for example, by brazing or hard soldering. After the stones are placed in the cavities, with the girdles or outer edges of the stones in adjacent cavities substantially contiguous, the securing rods or stirrup members are bent over and pressed down against the adjacent edge portions of the stones, and their free outer ends are brazed to the opposite face of the mount. The downward pressure of the stirrups on the sloping edges of the stones has a longitudinal wedging effect which holds the stones securely in place in the mount.

In the alternative mount and process illustrated in Figure 6 of the patent, the stirrups are preformed with both ends already brazed to opposite sides of the mount before the stones are placed in the mount. The stirrups are bent to a sufficiently large radius and are sufficiently flexible that the stones can be inserted into the cavities in the mount by springing slightly apart the stirrups at either side. The stirrups are then pressed down against the edges of the stones to secure the stones in place.

The first article claim 1 and the first method claim 5 are each generic to both of these alternative embodiments; the article claim 3 and the method claim 6 cover the embodiment of Figures 1–4 in which the free ends of the rods are brazed after setting of the stones; while the article claim 4 and the method claim 7 cover the version of Figure 6 in which the stirrups are preformed with both ends already attached to the mount before placement of the stones.

Chirol filed corresponding patent applications in France, Netherlands and in five other foreign countries through his French patent attorney, Dr. Alain Casalonga ("Casalonga"). Chirol gave Casalonga full authority and responsibility for the prosecution of all of the applications including the United States application, which was filed through Casalonga's Washington, D. C. correspondent firm, Holcombe, Wetherill and Brisebois ("Brisebois").

In the first official action in the parent U. S. application, mailed April 25, 1966, all of the claims were indicated to be allowable "except for formal matters," specifically that Claims 4–6 were obviously "non-statutory," the original Claim 4 being a dependent claim without a specified antecedent claim and original Claims 5 and 6 being article claims dependent on a plurality of method claims. The only prior art cited in the action was patent No. 2,610,385 to Manne, which was cited only to show a device of "the same general configuration" and which was not otherwise described nor applied to the claims. In accordance with a new PTO practice of "compact prosecution," the prosecution was closed.

In response to this official action, Chirol filed a "streamlined continuation" application making no changes except to cancel the original non-statutory claims 4–6 and substitute four new article claims corresponding to patent claims 1–4. On the first official action mailed November 14, 1966 in connection with the continuation application, all of the claims were allowed without any prior art being cited. A copy of this official action was sent to Casalonga in Paris, who acknowledged receiving it on November 22, 1966.

Earlier, in July 1965, Casalonga had received a copy of an official action of the Dutch Patent Office in connection with Chirol's corresponding Dutch application. In this official action, all of the claims of the Dutch application were rejected as unpatentable over the 1925 French patent No. 597,629 to Societe Matheret et Garreau ("Matheret"). Casalonga in turn sent a copy of this official action, which was in the Dutch language, to Chirol, who did not read Dutch. Casalonga did not at that time send Chirol a copy of the Matheret patent, nor tell him what it disclosed, nor even that the Dutch claims had been rejected on Matheret.

The Matheret patent discloses a jewelry article similar to that of the Chirol patent, in which the mount is provided at its upper face with a row of closely spaced frusto-conical cavities extending longitudinally of the mount, with stones supported in the respective cavities and securing wires or

stirrups extending across the edge portions of adjacent stones, and with the ends of the stirrups soldered to opposite sides of the mount. The downward pressure of the wires on the sloping upper edge portions of the stones would obviously have a longitudinal wedging effect on the stones, just as in Chirol.

On December 8, 1966, Casalonga mailed instructions to his Dutch correspondent, Nederlandsch Octrooibureau, in which he discussed Matheret as follows:

"In this patent, use is made of a thin metal wire, most likely bent beforehand into the shape of a stirrup, and this is placed across a support mounting at the point where the precious stones—lodged in seatings—join. The end of one of the prongs of the stirrup is soldered; the cross part of the stirrup is bound, and the end of the other prong is soldered onto the mounting.

"At first glance, this patent seems to predate the CHIROL procedure, which is the object of the pending application. But if we analyze the two inventions objectively, we are forced to agree that the procedure should be considered as an important improvement, perfectly patentable and clearly new, over the MATHERET–GARREAU procedure.

"Indeed, as indicated above, in the MATHERET–GARREAU patent, we must first of all make a thin stirrup, which will be difficult to handle, then solder one of the ends of these stirrups onto the mounting, then bind the middle part of the aforesaid stirrup and solder the other end in the same way as the first. The execution of these operations is time-consuming and delicate, given the smallness of the stem.

"The CHIROL procedure aims to avoid this disadvantage. It consists of using a ring 1, or other support, on one of the side faces; on this ring radial arms have been soldered beforehand. (fig. 1 of the sketch annexed to the pending application.) These arms are made up of thin flexible stems 4. After the stones are placed in the seatings of the mounting,

these stems 4 are bent back and bound successively between the stones in such a way as to make them exert pressure, pressing these stones into the settings and wedging them sideways. Each stem is then soldered onto the other side face of the mounting and the excess ends of the stems are cut off; . . . ."

Thus the only distinction which Casalonga attempted to draw between Matheret and the method illustrated in Figures 1–5 of Chirol was the assumption that in Matheret both ends of the stirrups are soldered to the mount after the stones have been placed in the cavities on the mount.

However, the Matheret specification describes the mounting in less specific terms:

"The linking of two consecutive stones A is accomplished by straddling them at their point of contact with a thin metal wire 1, whose pendant ends are soldered to the lateral sides of the setting B."

The Matheret specification thus does not state that both ends of each securing wire are soldered to the mount after the stones are placed in the cavities of the mount, as plaintiff assumes. Indeed, it does not even exclude the possibility that both ends are soldered to the mount before the stones are inserted, as in the embodiment illustrated in Figure 6 of the Chirol patent.

In its brief in opposition to the motion, plaintiff argues that the method disclosed in Matheret is inoperative and could not be employed commercially because soldering the ends of the wire stirrups to the sides of the mount after the stones are in place in the mount would destroy the stones. This argument cannot be credited in view of the fact that in the Chirol patent, in the process illustrated in Figures 1–4 and specifically claimed in Claim 6, the free ends of the stirrup members, after being bent over the edge portions of adjacent stones, are soldered to the side of the mount. If soldering with the stones in place would actually destroy the stones, as plaintiff asserts, the primary method disclosed and claimed by Chirol would be just as inoperative as that of Matheret.

Moreover, regardless of the process employed, Matheret unquestionably discloses a completed jewelry article which fully anticipates at least the article claims 1 and 2 of the Chirol patent.

By November 22, 1966, when Casalonga received a copy of the official action allowing the continuation application, he knew that all of the claims had been allowed without any prior art ever having been applied against the claims by the PTO. Although he had known of the Matheret patent at least since July 1965, and had discussed in detail its relevance to Chirol's claimed invention, he said nothing about it to his Washington correspondent, Brisebois, and it was therefore never brought to the attention of the PTO.

In September 1981, during the pendency of the present action, Chirol's New York trial attorneys became aware of the Matheret patent when it was cited in litigation abroad on Chirol's corresponding French patent. Shortly thereafter, they brought it to the attention of this Court at a pre-trial conference and on September 14, 1981 they filed an application for reissue of the Chirol patent for the purpose of having the PTO reconsider the claims in the light of Matheret. On December 23, 1981, before the first official action in connection with the reissue application, they filed a voluntary supplemental amendment cancelling Claims 1, 2 and 3 of the Chirol patent and stating:

"This voluntary amendment is filed pursuant to applicant's recent discovery of additional prior art which potentially has the effect of making the claims of the assigned patent too broad or invalid and not consistent with the known prior art."

Thus, whatever arguments may be made as to the operability of the process disclosed in the Matheret patent, it is beyond question more relevant than any prior art cited by the PTO during the prosecution of the original and continuation applications for the Chirol patent.

*The applicable law*

■ Because of limitations on the time and facilities available to the PTO to search for prior art relevant to pending applications for patent, or to conduct tests to check assertions of efficacy or superiority, the PTO must rely heavily on the representations of patent applicants. The Supreme Court has therefore ruled that every patent applicant has an "uncompromising duty" to report to the PTO all facts affecting the patentability of the inventions claimed, to assure that "patent monopolies spring from backgrounds free of fraud or other inequitable conduct." *Precision Instruments Mfg. Co., et al. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381, *petition for clarification denied*, 325 U.S. 843, 65 S.Ct. 1561, 89 L.Ed. 1967, *rehearing denied*, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945); *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968 (S.D.N.Y.1971), Mansfield, J.). Patent applicants must show "the highest degree of candor and good faith." *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949), *rehearing denied*, 338 U.S. 939, 70 S.Ct. 341, 94 L.Ed. 579 (1950). They stand "before the Patent Office in a confidential relationship and [owe] the obligation of frank and truthful disclosure." *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574, 579 (6th Cir. 1968). ". . . [O]ur patent system could not function successfully if applicants were allowed to approach the Patent Office as an arm's length adversary." *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 565 (5th Cir. 1970).

■ This duty of candor applies equally to the applicant and his attorney, 37 C.F.R. § 1.56(a),[2] even where a foreign attorney

---

2. § 1.56 Duty of disclosure; striking of applications.
   (a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively

involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the

has primary responsibility for the prosecution of the application and acts only through a correspondent attorney in the United States. *Aktiebolaget Celloplast v. Italmar Plastic Products, Inc.*, 193 U.S.P.Q. 299, 304 (E.D.N.Y.1977). Thus it constitutes fraud or inequitable conduct for the foreign attorney to withhold from his U.S. correspondent information as to prior art more relevant than that cited by the PTO. *Ibid.*

■ A patent obtained by fraud or inequitable conduct in the prosecution of the application is invalid and/or unenforceable. *Precision Instrument Mfg. Co. et al. v. Automotive Maintenance Machinery Co., supra; Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 125, *rehearing denied,* 322 U.S. 772, 64 S.Ct. 1281, 88 L.Ed. 1596 (1944); *Timely Products Corp. v. Arron,* 523 F.2d 288, 297–98 (2d Cir. 1975).

Proof of such fraud or inequitable conduct requires clear, unequivocal and convincing evidence. *Delong Corp. v. Raymond International, Inc.,* 622 F.2d 1135, 1145–46 (3d Cir. 1980); *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 186–87 (8th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 771 (1977); *Schnadig Corp. v. Gaines Mfg. Co., Inc.,* 494 F.2d 383, 392 (6th Cir. 1974).

■ Like common law fraud, fraud on the PTO requires a showing of (1) deceptive intent or willful misconduct on the part of the applicant or his attorney and (2) materiality of the information which is misrepresented to or withheld from the PTO. *Hercules, Inc. v. Exxon Corp.,* 497 F.Supp. 661 (D.Del.1980, Wright, J.); *In re Multidistrict Litigation Involving Frost Patent,* 398 F.Supp. 1353, 1366 (D.Del.1975, Wright, J.), *modified on other grounds,* 540 F.2d 601 (3d Cir. 1976).

Because of the unlikelihood of obtaining direct evidence of the subjective intent of the applicant, the courts have accepted in-

stead a showing of willful or gross misconduct:

" '. . . [A]n intentional scheme of deception is not necessary to a showing of 'fraud on the Patent Office.' Nevertheless a not insubstantial degree of 'wrongfulness' *is* required to be shown. Applicants for patents do not engage in fraudulent conduct when they make 'honest mistakes in judgment' concerning the information material to consideration of their applications, nor does some slight deviation from the requisite standard of care suffice as evidence of fraud." *Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 715 (1st Cir. 1981).

"Although the type of misconduct before the Patent Office which results in the invalidity of a patent admits to no fixed parameters, it is necessary that there be some element of wrongfulness, willfulness, or bad faith. . . . Hence mere negligent omissions or misstatements to the Patent Office do not provide sufficient basis for a finding of fraud . . . ." *Parker v. Motorola, Inc.,* 524 F.2d 518, 535 (5th Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976) (citations omitted).

See also *Pfizer, Inc. v. International Rectifier Corp., supra,* 538 F.2d at 186; *Aktiebolaget Celloplast v. Italmar Plastic Products, Inc., supra,* 193 U.S.P.Q. at 304.

Insofar as the materiality element of the fraud defense is concerned, courts have on various occasions required different levels of materiality:

(1) an *objective* "but for" standard, which requires a showing that the patent could not have issued "but for" the misrepresentation or concealment;

(2) a *subjective* "but for" standard, which requires a showing that the PTO examiner would not have allowed the application if he or she had known the facts in question (the testimony of the examiner is, of course,

examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding

whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

highly relevant if not necessary to such a determination);

(3) a "but it may have" standard, which requires merely a showing that the facts might reasonably have affected the examiner's decision as to patentability.

*Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 899 (10th Cir. 1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Norton v. Curtiss*, 433 F.2d 779; 795–96 (C.C.P. A.1970); *In re Multidistrict Litigation Involving Frost Patent, supra*, 398 F.Supp. at 1368; Patent Law Perspectives, 1978 Developments, § G.1[2]–26.

There is considerable current support for the "but it may have" standard. See Patent Law Perspectives, 1972 Developments, § G.1[1]–56. Thus in *Digital Equipment Corp. v. Diamond, supra*, 653 F.2d at 716, the Court of Appeals for the First Circuit stated:

"This is not to say that a strict 'but for' test of materiality must be applied in every instance, or that it would necessarily be inappropriate to test the materiality of misrepresentations or nondisclosures against a standard somewhat different from the formulation used in *Norton*. See *True Temper Corp. v. CF&I Steel Corp.*, 601 F.2d 495, 504 (10th Cir. 1979); *In re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 604 n.9 (3d Cir. 1976); *Timely Products Corp. v. Arron*, 523 F.2d 288, 297–98 (2d Cir. 1975). Questions of 'materiality' and 'culpability' are often interrelated and intertwined, so that a lesser showing of the materiality of withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of withheld information would necessarily create an inference that its nondisclosure was 'wrongful.' See *United States v. Standard Electric Time Co.*, 155 F.Supp. 949, 952–53 (D.Mass.1957). To establish fraud, however, the nondisclosed information must be such as to have a likely effect on the scope of allowable claims or the issuance of the patent. It is not enough that the

information be simply 'relevant' in some general sense to the subject matter of the claimed invention, or even to the invention's patentability."

And in *Pfizer, Inc. v. International Rectifier Corp.*, 186 U.S.P.Q. 511, 515 (D.Minn. 1975), *rev'd on other grounds*, 538 F.2d 186 (8th Cir. 1976), the Court stated:

"The requirement of absolute candor and full and complete disclosure in prosecuting patent applications precludes the withholding of 'material' prior art, facts and beliefs from, as well as the affirmative misrepresentation of 'material' prior art, facts and beliefs to, the Patent Office. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 165 USPQ 355 (5th Cir. 1970); *Monsanto Company v. Rohm & Haas Company, supra*.

＊　　＊　　＊　　＊　　＊　　＊

" 'Materiality' under *Beckman* and *Monsanto, supra*, does not require that the patent would not have issued as a matter of law 'but for' the misrepresentation or concealment, but only that the misrepresentation or withholding be relevant to an issue of patentability. *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461, 149 USPQ 99 (D.Del.1966), *rev'd on other grounds*, 374 F.2d 473, 153 USPQ 1 (3rd. Cir. 1967), *cert. denied*, 389 U.S. 826 [88 S.Ct. 65, 19 L.Ed.2d 80], 155 USPQ 767 (1967); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., supra*; *SCM Corp. v. Radio Corporation of America*, 318 F.Supp. 433, 167 USPQ 196 (S.D.N.Y. 1970); *CPC International, Inc. v. Standard Brands Inc.*, 385 F.Supp. 1057, 184 USPQ 332 (D.Del.1974); *United States Movidyn Corp. v. Hercules Incorporated*, 388 F.Supp. 1146, 185 USPQ 116 (D.Minn. 1975).

"In most of these cases the testimony of the Examiner was unavailable; thus, the Courts have adopted the rule that even if the applicant misrepresents or withholds facts which are not material in a 'but for' sense, the Courts will refuse to enforce the patent if the applicant has

misrepresented to the Patent Office facts which may be relevant to an issue of patentability."

Moreover, the courts have uniformly ruled that "unclean hands" or inequitable conduct of a patent applicant short of technical fraud will disentitle the patent owner to equitable relief and thus render the patent unenforceable. For example, in *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc.*, 620 F.2d 1247, 1274 (8th Cir. 1980), Chief Judge Markey of the Court of Customs and Patent Appeals, sitting by designation, wrote:

"This circuit has recognized that inequitable conduct short of fraud can be a defense in a patent infringement suit. *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). To make out a case of inequitable conduct Berkley must prove, by 'clear, unequivocal and convincing evidence,' *Pfizer, Inc. v. International Rectifier Corp., id.* at 187, that DuPont's conduct made it impossible for the PTO to fairly assess the patent application against the prevailing statutory criteria, *In Re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 604 n.9 (3d Cir. 1987), and that it involved 'some element of wrongfulness, willfulness or bad faith." *Pfizer, Inc. v. International Rectifier Corp., supra* at 186. If the information be irrelevant, its innocent or negligent misrepresentation or non-disclosure, whether or not intentional, does not amount to inequitable conduct. *Pfizer, Inc. v. International Rectifier Corp., supra*, at 186; . . . ."

A defense of inequitable conduct requires less stringent proofs as to both materiality and intent. As explained in *Norton v. Curtiss, supra*, 433 F.2d at 795–96:

"Thus, in suits involving patents, today, the concept of 'fraud' on the Patent Office (at least where a patentee's conduct pertaining to the relative merits of his invention is concerned), encompasses not only that which we have earlier termed 'technical' fraud, but also a wider range of 'inequitable' conduct found to justify holding a patent unenforceable. The courts differ as to the conduct they will recognize as being sufficiently reprehensible so as to carry with it the consequences of technical fraud. Nevertheless, one factor stands clear: the courts have become more critical in their interpretation of the relationship existing between applicants for patent and the Patent Office and their scrutiny of the conduct of applicants in light of that relationship.

\*      \*      \*      \*      \*      \*

"Findings of materiality should not be limited only to those situations where there can be no dispute that the true facts, or the complete facts, if they had been known, would most likely have prevented the allowance of the particular claims at issue or alternatively, would provide a basis for holding those claims invalid. In such cases, the claims at issue would probably be invalid, in any event, because of the *existence* of those facts, *in and of themselves.* Whether the claims would also be unenforceable because a fraud was committed in misrepresenting the facts to the Patent Office would really be of secondary importance. (Emphasis in original.)

\*      \*      \*      \*      \*      \*

"The state of mind of the one making the representations is probably the most important of the elements to be considered in determining the existence of 'fraud.' Perhaps it is most of all in the traditional element of 'scienter' that the existence of a fiduciary-like duty should have its effect. As we have already indicated, the procurement of a patent involves the public interest, not only in regard to the subject matter of the patent grant, but also in the system under which that grant is obtained. Conduct in this area necessarily must be judged with that interest always taken into account and objective standards applied. Good faith and subjective intent, while they are to be considered, should not *necessarily* be made controlling. Under ordinary circumstances, the *fact* of misrepresentation coupled

with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth." (Emphasis in original.)

In *Timely Products Corp. v. Arron, supra,* 523 F.2d at 297–98, the author, writing for the Second Circuit, questioned the practical significance of the distinction between the fraud and inequitable conduct:

"There is indeed precedent in the decisions cited, among others, for a distinction between fraud, which invalidates a patent, and unclean hands, which renders it unenforceable. But where, as here, the unclean hands arose in connection with the prosecution of the patent application, so that the wrong cannot be purged while the patent remains in force, the distinction is without practical significance insofar as the consequences are concerned. In either case, the only value the patent has—the right to exclude others from the use of the invention during the patent term—is irreparably destroyed." (footnote omitted).

This doubt was contemporaneously but independently voiced by Judge Wright of the District of Delaware in *In re Multidistrict Litigation Involving Frost Patent, supra,* 398 F.Supp. at 1367–68:

"This Court reads the latest opinions of this Circuit, *Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, *cert. denied,* 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), and *Trio Process Corp. v. L. Goldstein's Son's, Inc.,* 461 F.2d 66, *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972), as eliminating any distinction between unclean hands leading to unenforceability and fraud leading to invalidity, for as this Court reads those decisions all proscribed conduct should result in an invalidity decree. Elimination of the distinction was not unreasonable, for to date it has been of little practical consequence to the parties in infringement suits whether a court ultimately held a patent invalid for fraud or unenforceable for unclean hands. There have been suggestions by commentators that possibly different res judicata effects could flow from the two types of decisions or that, in some instances, unclean hands could be purged, leading to later enforceability of patents previously held unenforceable, but such distinctions have not been articulated in the reported opinions." (footnote omitted).

More recently, in *Warner-Jenkinson Co. v. Allied Chemical Corp.,* 477 F.Supp. 371, 394, n.86 (S.D.N.Y.1979) *aff'd without opinion,* 633 F.2d 208 (2d Cir. 1980), Judge Weinfeld of this Court observed that such a difference would result:

"A declaration of 'unenforceability' of the patents in suit would not prejudice defendants' ability to reapply to the Patent Office and acquire a new patent; a declaration of invalidity would preclude reapplication."

But in *Application of Clark,* 522 F.2d 623 (C.C.P.A.1975), the Court of Customs and Patent Appeals ruled that a patentee who, during prosecution of the application for his original patent, had knowingly withheld from the PTO knowledge of prior art more relevant than that cited against the application, could not cure the defect by obtaining a reissue of the patent under 35 U.S.C. § 251:

"Reissue is not available to rescue a patentee who had presented claims limited to avoid particular prior art and then had failed to disclose that prior art (the examiner not having cited it) after that failure to disclose has resulted in the invalidating of the claims. The sole goal of appellant in soliciting a reissue is to have the examiner *re*-examine his claims in light of the reference he originally failed to disclose in order, apparently, to relieve him of the consequences of his failure.

"While this court has often said that § 251 is to be liberally construed as a remedial statute, *In re Oda,* 443 F.2d 1200, 58 CCPA 1353 (1971), we do not feel

that such liberalism extends to eradication of a dereliction of a duty by what is, in effect, a re-prosecution in which the examiner is now given an opportunity to pass on patentability in light of a very pertinent reference which the applicant knowingly withheld from him. We cannot equate this with 'error,' or with 'inadvertence, accident, or mistake.' "

See *also Digital Equipment Corp. v. Diamond, supra,* which was an action for review of a rejection by the PTO of an application for reissue of a patent on the ground that the original patent was obtained by fraud.

The courts have generally agreed that "[f]raud or inequitable conduct in obtaining a single claim of a patent renders the entire patent invalid or unenforceable." *Pfizer, Inc. v. International Rectifier Corp., supra,* 186 USPQ at 517. Thus in Patent Law Perspectives, 1977 Developments, § G.1[1]–189, the authors summed up:

"The gravamen of the fraud defense is that the patentee has failed to discharge his duty of dealing with the examiner in a manner free from the taint of 'fraud or other inequitable conduct.' If such conduct is established in connection with the prosecution of a patent, the fact that the lack of candor did not directly affect *all* the claims in the patent has never been the governing principle. It is the inequitable conduct that generates the unenforceability of the patent and we cannot think of any cases where a patentee partially escaped the consequences of his wrongful acts by arguing that he only committed acts of omission or commission with respect to a limited number of claims. It is an all or nothing proposition." (Emphasis in original.)

Of course, where, as here, the fraud or inequitable conduct defense is raised in a motion for summary judgment, the motion may be granted only if it is clear that no genuine issue of material fact exists. *Pfizer, Inc. v. International Rectifier Corp., supra,* 538 F.2d at 185; *Xerox Corp. v. Dennison Mfg. Co., supra,* 322 F.Supp. at 966–67. But this barrier is not an insurmountable one in the rare case, such as the present, in which the relevant facts are clearly established by an incontrovertible documentary record.

*Discussion*

Measured against even the strictest fraud standard, the undisputed facts in this case render the Chirol patent invalid.

■ The prior Matheret patent, about which Chirol's attorney Casalonga learned even before Chirol's U. S. continuation application was filed, was beyond any question highly relevant to the claimed invention. Indeed, Matheret fully anticipated at least the article claims 1 and 2 of the continuation application, as Chirol's attorneys obviously recognized when they cancelled these claims from the reissue application.

Casalonga had become acutely aware of the relevance of Matheret when it was relied upon in rejecting the claims of the corresponding Dutch application. Moreover, he knew that no prior art whatever had been applied against the article claims by the United States PTO, which had allowed the claims on the first official action after they were presented. There is simply no way Casalonga could have been unaware of the critical significance of Matheret to the patentability of the U. S. claims.

Foreign patent attorneys representing applicants for U. S. patents through local correspondent firms surely must be held to the same standards of conduct which apply to their American counterparts; a double standard of accountability would allow foreign attorneys and their clients to escape responsibility for fraud or inequitable conduct merely by withholding from the local correspondent information unfavorable to patentability and claiming ignorance of United States disclosure requirements.

In an attempt to prove a subjective intent to defraud defendant took the deposition of Casalonga but, when Casalonga was asked why he had failed to call Matheret to the attention of his local correspondent, Brisebois, he answered only that he did not consider Matheret a "relevant reference" against the Chirol application. When

pressed to point out specific differences between the inventions claimed by Chirol and the disclosure of Matheret, Caslonga called the examining attorney "stupid and . . . an unfair man" (Tr. 39) and walked out.

But where, as here, the relevance of the prior art is so clear and unquestionable, the Court can and must infer the existence of fraudulent intent or, at the very least, gross and reckless misconduct on the part of Casalonga.

Similarly, no matter which of the several standards of materiality is applied, it is obvious that the Chirol patent should not and would not have issued containing article claims which were fully anticipated by Matheret, if Matheret had been known to the PTO.

Even if some of the claims of the Chirol patent might arguably be patentable over Matheret, it is undeniable that the PTO examiner should at least have been given the opportunity to consider the matter, rather than proceeding in complete ignorance of Matheret, particularly where he had found no other prior art sufficiently relevant to warrant its being applied to Chirol's claims.

It is inconceivable that any evidence which could possibly be introduced at a trial would change the foregoing undisputed facts or weaken their impact. There is accordingly no reason why summary judgment should not be granted. The Court concludes that the Chirol patent was obtained by fraud on the PTO, and is invalid *in toto*. If the Court had any doubt about this conclusion, which it does not, it would still conclude that Chirol's attorney Casalonga was guilty of inequitable conduct in obtaining the patent and that it is unenforceable.

*Attorney's fees*

■ Fraud on the PTO normally renders a case "exceptional" within the intent of 35 U.S.C. § 285, and thus justifies an award of counsel fees to the prevailing party. *Timely Products Corp. v. Arron, supra*, 523 F.2d at 305; *Kahn v. Dynamics Corp. of America*, 508 F.2d 939 (2d Cir.), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

■ If this were an action brought by Chirol or a company of which he was a principal owner or responsible official, this Court would without hesitation charge defendant's counsel fees against the plaintiff. But the Chirol patent has been assigned first to Vitau and then to his company Gemveto. There is no evidence that Vitau or any other representative of Gemveto had any knowledge of fraud or inequitable conduct in obtaining the patent. Indeed, both Vitau and plaintiff's trial counsel have submitted affidavits averring that they did not learn of the Matheret patent until September 1981, shortly before it was called to the Court's attention and the application for reissue was filed. The action was thus filed and prosecuted in good faith. In these circumstances, the Court does not deem it appropriate to impose on plaintiff the burden of defendant's counsel fees.

*Summary*

Defendant's motion for summary judgment is granted; the Complaint is dismissed with prejudice and with the customary taxable costs, but without attorney's fees.

SO ORDERED.